FILED
COURT OF APPEALS
DIVISION II

2015 MAY 27 AM 9: 30

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHELCON CONSTRUCTION GROUP, LLC, a Washington limited liability company, | No. 42845-8-II |
| Respondent. | Consolidated with No. 44995-1-II |
| v. | |
| SCOTT M. HAYMOND and JANE DOE HAYMOND, husband and wife; A-3 VENTURE LLC, a Washington limited liability company; A-4 VENTURE, an unknown entity type; A-1111 VENTURE LLC, a Washington limited liability company; 14224 PIONEER LIVING TRUST; and ANCHOR MUTUAL SAVINGS BANK, | PUBLISHED OPINION |
| Appellants. | |
| SHELCON CONSTRUCTION GROUP, LLC, a Washington limited liability company, | No. 44995-1-II |
| Respondent, | |
| v. | |
| SCOTT M. HAYMOND and JANE DOE HAYMOND, husband and wife; A-3 VENTURE LLC, a Washington limited liability company; A-4 VENTURE, an unknown entity type; A-1111 VENTURE LLC, a Washington limited liability company; 14224 PIONEER LIVING TRUST, | |
| Defendants, | |
| ANCHOR MUTUAL SAVINGS BANK, | |
| Appellant. | |

WORSWICK, P.J. — In this consolidated appeal, Scott Haymond and Anchor Mutual Savings Bank (Anchor Bank) appeal judgments and decrees of foreclosure finding Haymond liable for $245,151.42 plus 18 percent interest, and prioritizing Shelcon Construction Group, LLC's (Shelcon) mechanic's lien above Anchor Bank's deed of trust. Haymond argues that the trial court erred by (1) awarding Shelcon 18 percent interest in the absence of a signed agreement to that amount, and by (2) miscalculating the amount of interest owed. Anchor Bank argues that the trial court erred by ruling that Shelcon's mechanic's lien on Haymond's property took priority over Anchor Bank's deed of trust on the same property despite the fact that Shelcon released its lien before Anchor Bank recorded its deed of trust. We find no error and affirm.

FACTS

A.    *Procedural Summary*

This consolidated case has a long and complicated history. In summary, Shelcon sued Haymond and Anchor Bank to foreclose its mechanic's lien on real property and to obtain payment on construction contracts. It also sought a declaration that its lien was superior in priority to Anchor Bank's deed of trust on the property.

Anchor Bank obtained summary judgment based exclusively on *Williams v. Athletic Field, Inc.*,[1] this court's case concerning lien notice. Following a bench trial between, the trial court granted lien foreclosure and contract damages to Shelcon. Our Supreme Court

---

[1] *Williams v. Athletic Field, Inc.*, 155 Wn. App. 434, 444, 228 P.3d 1297 (2010) (holding that an attestation clause signed by an employee of the lien filing service company did not satisfy the lien statute's requirement of corporate acknowledgement).

subsequently overturned the case upon which the trial court had relied in granting summary judgment to Anchor Bank.[2] The parties stipulated to an order vacating the summary judgment in Anchor Bank's favor, and a bench trial followed between Shelcon and Anchor Bank. The trial court ruled that Shelcon's mechanic's lien took priority over Anchor Bank's deed of trust.

B.    *Mechanic's Lien*

Scott Haymond, a real estate developer, owned several legal entities.[3] He initiated a development project, commonly known as "the Farm," at which he planned to build a commercial building.

Haymond contracted with Shelcon, a general contractor, to perform construction work at the Farm, including earthwork, excavation, demolition, clearing, and grading. Around January 17, 2006, Shelcon and Haymond first agreed to a scope of work for a contract price of $732,941.92. Haymond and Shelcon subsequently amended the scope of work and contract price several times.

---

[2] *Williams v. Athletic Field, Inc.*, 172 Wn.2d 683, 698, 261 P.3d 109 (2011) (holding that a claim of lien following the lien statute's sample form is valid even in the absence of a proper corporate acknowledgement).

[3] Haymond was the registered agent and sole governing person of A-111 Venture, LLC and A-1111 Venture, LLC (known unofficially as "A-4"). He also appeared to control and be the sole beneficiary of an entity called 14224 Pioneer Living Trust. 14224 Pioneer Living Trust owned the Farm at the time of this suit. Shelcon named these entities as defendants. For clarity, we refer to any or all of these entities as "Haymond."

On July 5 at 8:35 a.m., Shelcon's owner Shane Martin went to the Farm to prepare for clearing and grubbing[4] by measuring the Farm's boundaries. Martin marked the boundaries with fluorescent ribbon to assist Shelcon's employees in visually determining the boundary lines. Martin later testified that he never cleared and grubbed without first marking boundary lines. A few days later on July 10th and 11th, Shelcon employees cleared and grubbed the Farm.

On June 20, 2008, Shelcon recorded a $303,291.29 mechanic's lien at the Pierce County Auditor's Office for its work on the Farm. The lien reflected work beginning July 5, 2006.

C.      *Lien Release and Deed of Trust*

Meanwhile, at 2:14 p.m. on July 5, 2006, several hours after Martin began measuring boundaries at the Farm, Haymond granted a deed of trust to Washington First International Bank (Washington First) on the Farm, to secure a $1,540,000 loan. The parties recorded this deed of trust on July 5, 2006.

Around April 2008, Haymond sought a loan from Anchor Bank. Haymond sought financing to pay off the loan to Washington First and to provide extra funding to himself. When Anchor Bank learned of Shelcon's lien on the Farm, it told Haymond that it would not lend to him unless the Shelcon lien was released. Haymond asked Shelcon to release the lien, promising to pay Shelcon with loan proceeds from Anchor Bank. Shelcon released its lien with the purpose of enabling Haymond to obtain funding from Anchor Bank. Shelcon did not believe its release

---

[4] "Clearing and grubbing" refers to removing trees and removing roots, respectively. 1 Verbatim Report of Proceedings (VRP) (Feb. 4, 2013) at 96.

4

precluded it from claiming the unpaid work later. At the time of the lien release, Haymond owed Shelcon $303,291.29 and had paid only $17,000.

The lien release, recorded July 16, 2008, provided in part: "THE UNDERSIGNED LIEN CLAIMANT hereby releases the lien on the property owned or reputedly owned by. . . ." CP (Sept. 11, 2013) at 647. The release contained no language addressing whether Haymond had paid Shelcon or whether the lien release was limited or conditional in any way.

Prior to the lien release, Haymond requested an additional $300,000 in the loan amount from Anchor Bank, saying that his budget was "really close and tight." CP (Sept. 11, 2013) at 648. After the lien release, Haymond contacted Anchor Bank and claimed that the lien had been a misunderstanding. He falsely claimed that he owed Shelcon $303,291.29 for a project unrelated to the Farm, and that he had fully paid that amount. Anchor Bank accepted this explanation. Shelcon was unaware of this misrepresentation.

Also after the lien release, Haymond submitted several Shelcon invoices to Anchor Bank. The three invoices were dated July 21, 2008, and all three showed work being "100% complete" on discrete projects.[5] CP (Sept. 11, 2013) at 648. Shelcon had prepared these invoices and Haymond provided them to Anchor to obtain loan disbursements. Shelcon and Haymond understood that these three invoices, totaling $79,200, "represented part, but not all, of what Shelcon was owed at the time that the invoices were submitted."[6] CP (Sept. 11, 2013) at 648.

---

[5] One invoice, for $61,000, stated: "Water Line 100% complete." Another, for $8,200, stated: "Retention Pond 100% Complete." The third, for $10,000, stated: "Utility Trenching 100% Complete." CP (Sept. 11, 2013) at 648.

[6] Haymond owed Shelcon for invoices dating back to 2006.

Haymond did not disclose to Anchor Bank that he owed additional money to Shelcon. These were the only invoices that Haymond provided to Anchor Bank. Anchor Bank approved payment of these invoices, and inspected the Farm to verify that work described in the invoices was complete.

Anchor Bank never communicated with Shelcon or any of its employees, although it had Shelcon's contact information. Anchor Bank did not attempt to verify with Shelcon whether Haymond had paid the $303,291.29 lien amount. Instead, Anchor Bank relied upon the lien release and proceeded with the loan to Haymond. On August 22, 2008, Haymond recorded a deed of trust on the Farm to Anchor Bank as security for a $3,900,000 loan and release of Washington First's deed of trust.

D.    *Second Lien and 18 Percent Interest*

Shelcon and Haymond amended their scope of work and contract price on September 8, 2008, when Shelcon sent a letter and a contract to Haymond. This contract summarized all of Shelcon's work to date and all of Haymond's payments to date. It set out changes in the future scope of work and included new payment terms. These payment terms provided that Haymond pay Shelcon for any future extra work at cost plus 15 percent, that any overdue payments would accrue interest at 18 percent, and that Shelcon would be entitled to attorney fees and costs for any future enforcement actions. The contract called for immediate payment. The contract also included a merger clause:

> This Contract including Job Proposal and Scope of Work and the General
> Conditions attached hereto represent the entire agreement between the OWNER
> and CONTRACTOR and supersedes all prior negotiations, representations,
> correspondence, proposals or agreements. This Contract may be amended only
> by written instrument signed by both the OWNER and CONTRACTOR.

CP (Aug. 28, 2013) at 11.

Neither party signed this contract. Martin personally presented the contract to Haymond and the two discussed it, and Haymond never objected to its terms. Haymond accepted the revisions and accepted its terms and conditions. After the date of the contract, Shelcon began to charge Haymond cost plus 15 percent for all extra work, and Haymond began paying this amount.

After the initial lien release on July 16, 2008, Shelcon continued to work at the Farm until February 12, 2009. On May 1, 2009, Shelcon recorded a second lien on the Farm for $309,369.58. This amount included work Shelcon had initially included in the first lien. The lien requested interest, but it did not specify in what amount.

E.     *Lawsuits*

On December 31, 2009, Shelcon filed suit against Haymond and Anchor Bank. Shelcon sought contract damages in the amount of "no less than $300,000.00," with the interest rate as provided in the contract. CP (Aug. 28, 2013) at 7. It also sought foreclosure of its lien against the defendants' interests in the Farm, and an order declaring its lien interest superior to all others.

After Anchor Bank was dismissed on summary judgment, Shelcon's claims against Haymond proceeded to a bench trial. At trial, Haymond asked Martin whether he knew that 18 percent interest was "illegal and protested by Mr. Haymond." VRP (Sept. 19, 2011) at 173. Martin replied that he did not know 18 percent was illegal. Haymond then asked: "Is it correct that you're not asking for [18 percent interest] anymore?" VRP (Sept. 19, 2011) at 173. Martin responded, "From what I understand now, legally, you can only get 12 percent." VRP (Sept. 19,

7

2011) at 173. Haymond then asked, "But you sued for 18 percent. All I'm trying to find out is if you abandoned that part of your lawsuit?" to which Martin replied, "Correct, the difference between the 12 and 18, yes." VRP (Sept. 19, 2011) at 174. On further redirect examination, Martin acknowledged that the contract provided for 18 percent interest on unpaid amounts, that Haymond received the contract, and that Haymond authorized Shelcon to perform work after having the document "in hand." VRP (Sept. 19, 2011) at 186.

Shelcon prevailed in the bench trial against Haymond: the trial court found Haymond liable for an outstanding principal amount of $245,151.42. The trial court found that the September 8, 2008 letter and contract were a written memorialization, executed by the conduct of the parties. It concluded that Haymond owed 18 percent interest on the principal amount owing to Shelcon. The trial court entered a judgment and decree of foreclosure against Haymond. These findings of fact and conclusions of law were not binding on Anchor Bank, because Anchor Bank was not a participant in this trial.

After the parties stipulated to an order vacating the summary judgment in Anchor's favor, the lien priority case proceeded to a separate bench trial. The trial court entered a judgment and decree of foreclosure against Anchor Bank.

The trial court made the following conclusions of law:

> 2. Shelcon's work at the Subject Property during the morning hours of July 5, 2006 constituted an improvement to the Subject Property, such that, for priority purposes, Shelcon's lien relates back in time to 8:35 a.m. on July 5, 2006, which precedes the time that Washington First International Bank's deed of trust was recorded at 2:14 p.m. on the same day."

> 3. The doctrine of equitable subrogation permits Anchor Bank to step into the shoes of Washington First International Bank for lien priority purposes.

8

4. The application of equitable subrogation in this case does not affect the result, because Shelcon's lien had priority over Washington First International Bank's deed of trust.

. . . .

6. Shelcon's lien release on July 16, 2008 did not affect the amount for which Shelcon could subsequently lien after it had finished its work at the Subject Property.

. . . .

13. Anchor Bank did not meet its burden of proof concerning its affirmative defense that Shelcon's lien is barred by the doctrine of equitable estoppel.

. . . .

16. Shelcon's lien, which is comprised of the principal amount of $262,828.26, prejudgment interest on the principal amount accruing at an annual rate of twelve percent from May 1, 2009, and the attorneys' fees and costs awarded to Shelcon by Judge Fleming in the prior trial in the amount of $141,181.75, is superior in priority to Anchor Bank's deed of trust concerning the Subject Property.

CP (Sept. 11, 2013) at 631-33.

Haymond and Anchor Bank both appeal.

ANALYSIS

I. ANCHOR BANK'S ASSIGNMENTS OF ERROR TO FINDINGS OF FACT

As an initial matter, we address Anchor Bank's assignments of error to the trial court's findings of fact. Anchor Bank assigns error to 18 of these findings of fact—some in their entirety, and some only to the extent that we might draw certain conclusions from them. Thus, before addressing the merits of the appellants' claims, we evaluate whether Anchor Bank has properly assigned error to the findings of fact and, where it has done so, whether the challenged findings are supported by substantial evidence.

9

No. 42845-8-II
Consolidated wi No. 44995-1-II

A.  *Standard of Review*

We review a trial court's findings of fact to determine if substantial evidence supports

them and, if so, "whether the findings support the trial court's conclusions of law." *Hegwine v.*

*Longview Fibre Co.,* 132 Wn. App. 546, 555, 132 P.3d 789 (2006). Unchallenged findings of

fact are verities on appeal. 132 Wn. App. at 556. We review conclusions of law de novo. 132

Wn. App. at 556. We generally do not consider assignments of error unsupported by argument

and citations to the record. *Seattle Sch. Dist. No. 1 v. State,* 90 Wn.2d 476, 496, 585 P.2d 71

(1978).

B.  *Assignments of Error without Argument*

Several of Anchor Bank's assignments of error do not assign error to the finding of fact

as written, but instead attempt to assign error to a finding of fact to the extent we may construe it

in a particular way. Because Anchor Bank does not argue that the findings themselves lack

sufficient evidence, we do not address this type of assignment of error.[7] Several other

---

[7] Anchor Bank does not assign error to the following findings of fact (FOF), but instead assigns error to potential legal conclusions we might draw from them. RAP 10.3(a)(4) provides that an appellant must assign error to "each error a party contends was made by the trial court." We then review those findings for substantial evidence. *Hegwine,* 132 Wn. App. at 555. RAP 10.3(a)(4) does not address how such findings may be construed by a reviewing court. Thus, we decline to address the following assignments of error:
>   2. "FOF 9 to the extent that it may be construed as a finding that Shelcon conducted a survey and definitively determined the legal boundary lines of the Subject Property."
>   3. "FOF 10 to the extent that it may be construed as a finding that Shelcon conducted a survey and definitively determined the legal boundary lines of the Subject Property."
>   4. "FOF 13 to the extent that it may be construed as a finding that Shelcon conducted a survey and definitively determined the legal boundary lines of the Subject Property."
>   7. "FOF 18 to the extent it may be construed as a finding that Haymond and Shelcon entered any change order agreements."

assignments of error purport to assign error to a finding of fact as written but fail to argue why

substantial evidence does not support them. Because Anchor Bank fails to argue why these

findings of fact are erroneous, we do not consider them.[8]

---

8. "FOF 28 to the extent it may be construed as a finding that Shelcon reasonably believed, in light of its prior history with Haymond, that it would receive full payment from Haymond for its unpaid work or that Shelcon's reliance on promises by Haymond was reasonable."
9. "FOF 33 to the extent it may be construed that Haymond made the additional funding request to pay Shelcon's lien or that Haymond communicated to Anchor Bank that it was requesting additional funds to satisfy Shelcon's lien."
11. FOF 45 "to the extent it may be construed as a finding that Anchor Bank did not verify that the work described in submitted invoices was sufficiently complete before disbursing loan proceeds for payment." FOF 45 says: "Anchor Bank did not contact Shelcon to verify whether Shelcon's work was complete after Shelcon completed the work stated on the three invoices totaling $79,200.00." CP Anchor at 626.
18. "FOF 70 to the extent it may be construed as an obligation secured by a lien superior to Anchor Bank's lien." FOF 70 is a table concluding how much money Shelcon was owed. CP Anchor at 630-31. Anchor Bank does not challenge this amount in its argument. Br. of Appellant (Anchor Bank) at 4-7.

Furthermore, Anchor Bank does not argue that these potential constructions of the findings of fact lack substantial evidence.

[8] Anchor Bank does not support the following assignments of error with argument explaining why they are not supported by substantial evidence:
1. "FOF 6 only regarding the finding that "Scott Haymond accepted Shelcon's bid sometime after receiving it, but before Shelcon commenced work on the Subject Property."
5. "FOF 14 in its entirety." FOF 14 reads: "Visual establishment of the boundary lines of the Subject Property was necessary before commencing clearing and grubbing of the Subject Property in order to minimize the risk of Shelcon trespassing onto neighboring properties." CP (Sept. 11, 2013) at 622. Anchor Bank argues that visual establishment of the boundary lines was not legally an improvement, but it does not argue that the trial court lacked substantial evidence to find that such visual establishment was *necessary*.
6. "FOF 17 in its entirety." FOF 17 reads: "On or around August 15, 2006, Scott Haymond and Shelcon verbally agreed upon certain changes in the scope of work and the appropriate credits and debits to the contract price and the contract amount was reduced from $732,941.92 to $717,193[.]12 based upon a second written bid dated August 15, 2006." CP (Sept. 11, 2013) at 622.

11

C.  *Substantial Evidence Supports Contested Findings of Fact*

Anchor Bank assigns error to three findings and supports these assignments with argument. We address these assignments of error to determine whether substantial evidence supports them. *Hegwine*, 132 Wn. App. at 555.

First, Anchor Bank assigns error to finding of fact 39 "with regard to representations made to Anchor Bank through the submitted invoices." Br. of Appellant (Anchor Bank) at 5. Finding of fact 39 reads: "Shelcon never represented to Scott Haymond, Anchor Bank, or any other person or company that Shelcon was owed a total of only $79,200.00 in 2008." CP (Sept. 11, 2013) at 626. Anchor Bank argues that the three invoices totaling $79,200 and marked "100% complete" were such a representation, but it is clear from the language of these invoices that they were marked "100% complete" only for the work listed on the face of the invoice. Unchallenged finding of fact 34 describes that the invoices were labeled "Water Line 100%

---

13. "FOF 56 in its entirety." FOF 56 reads: "Prior to September 8, 2008, the practice and course of conduct between Shelcon and Scott Haymond was to apply all payments received from Scott Haymond to the oldest amounts due to Shelcon." CP (Sept. 11, 2013) at 628.

14. "FOF 60 in its entirety." FOF 60 reads: "Scott Haymond accepted the revisions to scope and price stated in the September 2, 2008 written memorialization and Scott Haymond accepted the additional terms and conditions stated therein, one of which stated that henceforth Scott Haymond would pay Shelcon for all extra work on the basis of cost plus fifteen percent (15%), which Shelcon did in fact charge Scott Haymond, and Scott Haymond did in fact pay to Shelcon thereafter." CP (Sept. 11, 2013) at 629.

16. "FOF 61 in its entirety." FOF 61 reads: "The September 2, 2008 written memorialization was executed by the conduct of Scott Haymond and Shelcon and called for substituted performance with regard to payment of interest and attorneys' fees, but did not call for any revisions to scope or cost of Shelcon's work or contract." CP (Sept. 11, 2013) at 629.

17. "FOF 67 in its entirety." FOF 67 reads: "During the course of Shelcon's work, Scott Haymond authorized and directed Shelcon to perform extra work in the amount of $229,029.74." CP (Sept. 11, 2013) at 630. Br. of Appellant (Anchor Bank) at 4-7.

complete;" "Retention Pond 100% Complete;" and "Utility Trenching 100% Complete." CP (Sept. 11, 2013) at 625. Thus, substantial evidence established that Shelcon never represented that $79,200 was the total amount owed.

Second, Anchor Bank assigns error to finding of fact 46. Finding of fact 46 states, "Neither Scott Haymond nor Anchor Bank ever requested Shelcon to sign a subordination agreement, a waiver of Shelcon's lien rights, or any other document purporting to compromise Shelcon's right to subsequently record a lien for work performed either before or after the date of Shelcon's July 16, 2008 lien release." CP (Sept. 11, 2013) at 626. Anchor Bank's briefing related to its assignment of error to finding of fact 46 does not address substantial evidence, but rather attacks the legal argument at issue in this appeal, that Shelcon's lien release constituted a "document purporting to compromise Shelcon's right to subsequently record a lien." CP (Sept. 11, 2013) at 626. We examine this legal argument below. But to the extent that Anchor Bank challenges the *factual finding* that Shelcon never executed a subordination agreement, a waiver, or a document (other than the lien release) purporting to limit Shelcon's rights, substantial evidence supports this finding of fact. Anchor Bank points to no such document in the record, except for the lien release, which it argues is *legally* a limitation of Shelcon's rights. Thus, this finding of fact is supported by substantial evidence.

Third, Anchor Bank assigns error to finding of fact 57. Finding of fact 57 reads:

Shelcon's letter to Scott Haymond dated September 8, 2008 informed Scott Haymond that Shelcon was agreeable to accepting Scott Haymond's offer to pay $79,200.00 to Shelcon in exchange for a partial lien release in this amount, but provided that Shelcon "reserved all lien rights, including the right to re-file a claim of lien for these and any other amounts that may become due.

13

CP (Sept. 11, 2013) at 629. As above, Anchor Bank appears to assign error to the legal

conclusion supported by this finding of fact: that Shelcon's lien release was partial, not total and

unequivocal. We address this legal argument below in our analysis of the effect of the lien

release. But substantial evidence supports the trial court's factual finding that the September 8,

2008 letter purported to reserve Shelcon's lien rights. This letter was before the trial court as

plaintiff's exhibit 64, and it included the following language: that Shelcon released the lien "to

assist [Haymond] , and reserved all rights, including the right to re-file a claim of lien for [the

existing amounts due] and any other amounts which may become due." Thus, the trial court had

substantial evidence to find as a matter of fact that Shelcon reserved its lien rights in the

September 8, 2008 letter.

## II. 18 PERCENT INTEREST

Haymond appeals the judgment, claiming that the trial court erred in its interest award.

He argues that an 18 percent interest rate cannot apply because Shelcon abandoned its claim for

18 percent interest and because Haymond never agreed to this term. Haymond further argues

that the trial court miscalculated the amount of interest due. We disagree.

A.    *Argument Not Abandoned*

Haymond argues that Shelcon abandoned its claim for 18 percent interest through

Martin's testimony during trial. Haymond fails to cite any authority that a party may abandon a

claim via witness testimony.

Martin, a non-lawyer, testified on cross-examination that he no longer believed he was

legally entitled to 18 percent interest. Martin appears to have conditioned this statement on

Haymond's counsel's insistence during cross-examination that the 18 percent interest term was

14

illegal. But as we discuss below, 18 percent interest is legal; in other words, the condition upon which Martin based his statement does not apply. Haymond provides no authority or reason for us to hold that Martin's confusion about the law during cross-examination should deprive Shelcon of the right to receive the 18 percent interest to which it is otherwise entitled. Haymond's argument that Shelcon abandoned its 18 percent interest claim fails.

B.      *Parties Agreed to 18 Percent Interest*

Haymond next argues that, because he never signed the contract including the 18 percent interest term, the trial court erred by finding that it applied to him. As a matter of first impression, we affirm the trial court's ruling that Haymond owes 18 percent interest, because the parties agreed to the 18 percent interest term in writing.

RCW 19.52.010(1) provides: "Every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of twelve percent per annum where no different rate is agreed to in writing between the parties." The statute does not expressly state whether a signature is required. Haymond argues that the trial court's finding that the contract providing for 18 percent interest was "executed by the conduct of the parties" is error under RCW 19.52.010. Br. of Appellant Haymond at 5-6.

Although there is no case law directly on point, we are guided by Washington cases construing RCW 19.52.010 and contract law generally. In *Topline Equip., Inc. v. Stan Witty Land, Inc.*, we examined the writing requirement of RCW 19.52.010, and held that the writing must specify the interest rate sought, or at least provide information sufficient to calculate the interest rate. 31 Wn. App. 86, 91, 639 P.2d 825 (1982). In other contexts, a valid written agreement can exist without one party's signature; acceptance of a written contract "may be

15

implied from conduct as well as from words." *Sanwick v. Puget Sound Title Ins. Co.*, 70 Wn.2d 438, 443, 423 P.2d 624 (1967) (holding that the lack of a signature did not render a contract not "'written'" for statute of limitations purposes where the party challenging the lack of signature "acted and has continued to act" under the unsigned instructions); *Hertzke v. State Dep't of Ret. Sys.*, 104 Wn. App. 920, 933, 18 P.3d 588 (2001) (holding that substantial evidence of a written agreement existed where there was a written offer followed by conduct as described in the written offer).

In the analogous context of the statute of frauds, some contracts must bear the signature of the person against whom enforcement is sought. RCW 19.36.010. In certain circumstances, the doctrine of part performance saves a contract that does not otherwise satisfy the statute of frauds. *Losh Family, LLC v. Kertsman*, 155 Wn. App. 458, 465, 228 P.3d 793 (2010). This exception exists because the statute of frauds seeks to reduce uncertainty in oral contractual relations, and when the parties have partly performed, that uncertainty is reduced. 155 Wn. App. at 465. Unwritten or unsigned agreements are saved under the doctrine of part performance when (1) the contract is proven by clear, cogent, and convincing evidence; and (2) the acts constituting part performance "unmistakably point to the existence of the claimed agreement." *In re Marriage of DewBerry*, 115 Wn. App. 351, 361-62, 62 P.3d 525 (2003) (citing *Granquist v. McKean*, 29 Wn.2d 440, 445, 187 P.2d 623 (1947)). These cases discussing the doctrine of part performance demonstrate that our law allows the enforcement of unsigned contracts, even where a signature is required, when it is clear from the parties' actions that such a contract existed.

Here, the trial court's finding of fact 30 states that the September 8, 2008 letter was a written memorialization executed by the conduct of the parties. The trial court therefore

concluded that Haymond owed 18 percent interest. Haymond challenges only finding of fact 30, so all other findings of fact are verities on appeal. *Hegwine*, 132 Wn. App. at 556. We thus accept as verities that (1) Shelcon sent the writing including the 18 percent interest term to Haymond, and (2) Haymond partially performed the revisions to the scope of work and contract price as outlined in the letter by paying Shelcon the amounts as stated there. Therefore, the unchallenged findings of fact demonstrate that Shelcon proposed the 18 percent interest term in a writing, and that Haymond partially performed it.

Moreover, evidence before the trial court supported its finding that the parties executed this agreement by their conduct. Martin's testimony demonstrated that Haymond discussed the contract document with Martin, that Haymond never objected to its terms, and that Haymond began to pay cost plus 15 percent as requested in the new contract, demonstrating that he was performing under the new contract's terms. Thus, substantial evidence supports the trial court's finding that Haymond's conduct constituted agreement to the 18 percent interest term.

We hold that where the interest term is in writing, and the debtor partly performed the provisions in the writing, RCW 19.52.010 is satisfied. Therefore, in this case, Haymond's performance under the written contract specifying 18 percent interest should satisfy RCW 19.52.010. We affirm the trial court's conclusion that Shelcon was entitled to 18 percent interest.

C.      *Calculation of Interest*

In the alternative, Haymond argues the trial court's calculation of interest owing is erroneous. We disagree.

17

Interest begins to accrue when payment is due if the lien claims interest accruing and the complaint prays for interest predating the lien filing. *CKP, Inc. v. GRS Const. Co.*, 63 Wn. App. 601, 618, 821 P.2d 63 (1991); *Standard Lumber Co. v. Fields*, 29 Wn.2d 327, 352, 187 P.2d 283 (1947). By contrast, where the lien does not request interest and the complaint does not seek interest from the date payment was due, prejudgment interest begins to accrue only when the lien is filed. *CKP*, 63 Wn. App. at 618; *Standard Lumber*, 29 Wn.2d at 352.

The trial court calculated prejudgment interest at $167,480.60. Haymond argues that the correct interest calculation is $110,317.95. Haymond's calculation is wrong: he calculates interest beginning when Shelcon filed the second lien on May 1, 2009. Shelcon's lien requested interest, and Shelcon's First Amended Complaint requested interest from the date payment was due. Payment was due on September 8, 2008 because the September 8 contract, executed by the conduct of the parties, called for immediate payment. The trial court properly computed interest owing from the time payment was due to the time of judgment, resulting in $167.480.60, and Haymond's argument fails.

### III. PRIORITY OF LIEN

Appellant Anchor Bank challenges the trial court's findings of fact and conclusions of law following the trial between Anchor Bank and Shelcon. It argues that the trial court erred in concluding that (1) Shelcon was entitled to record a second lien that included work from the previous lien, which Shelcon had released; (2) equitable doctrines did not apply to estop Shelcon from including its older work in the second lien; and (3) Shelcon began work on July 5, 2006, for the purposes of establishing Shelcon's lien priority over Anchor Bank's deed of trust. We find no error and affirm.

A.    *Standard of Review*

Where the pertinent facts are not in dispute, we review de novo the legal issue of the priority of one lien creditor over another. *Kim v. Lee*, 145 Wn.2d 79, 85-86, 43 P.3d 1222 (2001). We liberally construe the mechanic's lien statute to provide security for lien claimants. RCW 60.04.900; *Williams v. Athletic Field, Inc.*, 172 Wn.2d 683, 697, 261 P.3d 109 (2011). We review de novo whether the trial court's findings of fact supports its conclusions of law. *Scott's Excavating Vancouver, LLC v. Winlock Properties, LLC*, 176 Wn. App. 335, 341-42, 308 P.3d 791 (2013), *review denied sub nom. First-Citizens Bank & Trust Co. v. Gibbs & Olson, Inc.*, 179 Wn.2d 1011, 316 P.3d 494 (2014).

B.    *Ability To Record Second Lien*

Anchor Bank first challenges the trial court's conclusion that Shelcon was entitled to record a second lien that included work it had previously included in the first lien, which it had released. We affirm the trial court's ruling because a lien release where the underlying work is not fully paid does not prevent the lien claimant from later recording a second lien.

Anyone furnishing "labor, professional services, materials, or equipment for the improvement of real property" is entitled to a mechanic's lien "upon the improvement for the contract price of labor, professional services, materials, or equipment furnished." RCW 60.04.021. The statutory scheme is silent regarding the effect of a lien release. It provides that when the amount due has been paid and upon demand, the lien holder shall release the lien. RCW 60.04.071. It does not address the effects of a release upon the rights of any party if a release is granted without full payment being made.

19

Although there is no case in Washington directly on point, our case law and the rule of liberal construction of the mechanic's lien statute both strongly suggest that a lien release does not preclude a later filing of a lien for some work that was not fully paid but was included in the original released lien. In *A.A.R. Testing Laboratory, Inc. v. New Hope Baptist Church*, Division One of this court held that "[a]bsent a true subordination agreement, the priority of mechanics' and materialmen's liens against real property is not compromised by waiver and release agreements executed in exchange for payment through a certain date." 112 Wn. App. 442, 444, 50 P.3d 650 (2002).

In *A.A.R. Testing Laboratory*, a general contractor waived, released, and forever discharged its mechanic's lien on the subject property as part of a settlement agreement in which it also agreed to complete the work for a given sum. 112 Wn. App. at 445. Several days before the parties reached the settlement agreement releasing the lien, the owners of the subject property obtained two construction loans and issued a deed of trust to the lending bank. 112 Wn. App. at 446. The bank was aware of the dispute with the contractor, and it conditioned its loan on the lien release. 112 Wn. App. at 446. The bank never reached a subordination agreement with the contractor. 112 Wn. App. at 446. The contractor continued to execute lien releases and waivers as it received payment for the work. 112 Wn. App. at 446-47. Notwithstanding the lien waivers and releases, Division One of this court held that the contractor's lien rights retained their priority over the deed of trust. 112 Wn. App. at 449. It held that the release of liens did not extinguish the inchoate right to lien for previous unpaid work. 112 Wn. App. 449-50. Therefore, the court held, despite the lien releases, the contractor's priority over the bank's deed of trust still related back to the first date of work. 112 Wn. App. at 449.

20

In *Geo Exchange Systems, LLC v. Cam*, we held that the *expiration* of an original lien claim did not foreclose the lien holder from filing a second lien for the same amounts originally claimed. 115 Wn. App. 625, 632-33, 65 P.3d 11 (2003). We looked to the plain language of the mechanic's lien statute, RCW 60.04.021, and the section governing filing, and concluded that "as long as the claimant is still working on the contracted private project, a claimant may file a lien. A specific lien claim expires within the eight-month period under RCW 60.04.141, but the underlying right to claim a lien does not expire until 90 days after work ceases." 115 Wn. App. at 632-33. Thus, as in *A.A.R. Testing Laboratory*, we construed the lien rights broadly and held that a lien for an unpaid amount may be filed at any time allowable under the statutory scheme regardless of the expiration or release of a prior lien for the same amount.[9]

Finally, in *West v. Jarvi*, our Supreme Court gave effect to the broad language of the mechanic's lien statutes and held that the voluntary release of a lien did not prevent the lienholder from filing a second lien upon the discovery that some work had been accidentally omitted from the first lien. 44 Wn.2d 241, 250, 266 P.2d 1040 (1954). The *West* court held that a rule limiting lien rights "would serve no good purpose, would thwart the legislative intent, and would enable property owners to defeat lien claims for materials and services of which they had received the benefit." 44 Wn.2d at 250. The court acknowledged that estoppel might be

---

[9] We noted in dicta in *Geo Exchange Systems* that there was no "innocent third-party involved," as part of our explanation why the first lien's expiration did not foreclose the possibility of refiling. 115 Wn. App. at 632. Anchor Bank argues that this fact distinguishes that case because Anchor Bank was an "innocent third party" who was prejudiced by the lien release here. But the existence of an "innocent third party" does not affect the analysis whether the lien release statute foreclosed Shelcon's right to file a second lien. *Geo Exchange Systems* and *A.A.R. Testing Laboratory* relied on the plain language of the statutory scheme, as do we.

appropriate on different facts, such as where the real property owner had relied to her detriment

on the lienholder's release. 44 Wn.2d at 250. However, in general, the court held that the

release of a lien for less than the amount due (where the amount liened had been paid) did not

prevent the contractor from filing a second valid lien. 44 Wn.2d at 251.

Here, the trial court interpreted the statute to mean that the "release of that first lien is not

encumbrance [sic] upon the second lien unless it affirmatively says that the lien was satisfied."

VRP Sept. 28, 2012 at 17. The facts of this case differ from the facts of *A.A.R. Testing*

*Laboratory*, *Geo Exchange Systems*, and *West* in a few ways, but we adopt the broad

interpretation of RCW 60.04.021 that those cases employed. Anchor Bank does not supply, and

we are not aware of, any case law holding that a lien release extinguishes the right to lien any

work that was unpaid.[10]

We hold that Shelcon's lien release did not extinguish its right to file a lien for the unpaid

amount. The lien release statute is completely silent regarding the legal effect of a voluntary lien

---

[10] Anchor Bank urges us to construe the objective meaning of the release—that it completely
extinguished all claims on the unpaid work—based on contract principles. In support of this
argument, Anchor Bank cites *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 187, 840
P.2d 851 (1992). But that case holds that *liability* releases, not *lien* releases, are governed by
contract principles. 120 Wn.2d at 187. Anchor Bank fails to provide any case law holding that
*lien releases* are subject to contract principles, and so we construe the lien release based on the
statutory scheme governing mechanic's liens.

Anchor Bank also cites *DKS Const. Mgmt., Inc. v. Real Estate Improvement Co.*, 124 Wn.
App. 532, 102 P.3d 170 (2004). In that case, Division Three of this court held that a mechanic's
lien was extinguished when the lienholder "voluntarily and intentionally released its lien." 124
Wn. App. at 537. But the *DKS* court held that the lienholder was not entitled to file a second lien
outside the 90-day statutory period after the last day of work. The court did not hold that a
release extinguishes the right to refile a lien *within* 90 days of the last day of work, as required by
60.04.091. *DKS* is therefore inapplicable to this case, because Shelcon did file its second lien
within 90 days after its last day of work.

release *without* full payment; it merely holds that a lien shall be released upon request when full payment has been made. RCW 60.04.071. Meanwhile, the statute broadly provides that anyone furnishing "labor, professional services, materials, or equipment for the improvement of real property" is entitled to a mechanic's lien "upon the improvement for the contract price of labor, professional services, materials, or equipment furnished." RCW 60.04.021. We construe this statute liberally. *Williams*, 172 Wn.2d at 697. All cases examining similar issues, while factually distinct, conclude that a second lien is permissible. We hold that Anchor Bank has failed to demonstrate that Shelcon was not entitled to file a second lien that included unpaid work it had previously released and, therefore, find no error in the trial court's conclusions of law 5 and 6.

C.     *Equitable Estoppel*

Anchor Bank further argues that even if Shelcon was entitled to file a second lien, Shelcon should be equitably estopped from asserting that lien because it misrepresented the status of its outstanding work to Anchor Bank. We disagree because Anchor Bank's reliance on the lien release as a statement that Haymond had fully paid for Shelcon's work was unreasonable.

Equitable estoppel is a question for the trier of fact unless only one reasonable inference can be drawn from the evidence. *Colonial Imports, Inc. v. Carlton Nw., Inc.*, 121 Wn.2d 726, 737, 853 P.2d 913 (1993). Courts disfavor equitable estoppel, so a party claiming estoppel must prove its elements by clear, cogent, and convincing evidence. *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 54, 271 P.3d 973 (2012).

To prove equitable estoppel, Anchor Bank must demonstrate that (1) Shelcon made an admission, statement, or act inconsistent with a claim it later asserted; (2) Anchor Bank reasonably relied on Shelcon's admission, statement, or act; and (3) Anchor Bank was injured as a result. *See Liebergesell v. Evans*, 93 Wn.2d 881, 888, 613 P.2d 1170 (1980). Regarding the second element, where a party does not know the true facts, reliance is justified only where that party had no means to discover them. *Concerned Land Owners of Union Hill v. King Co.*, 64 Wn. App. 768, 778, 827 P.2d 1017 (1992).

We assume without deciding that Anchor Bank can demonstrate the first and third factors of equitable estoppel: that Shelcon made a statement inconsistent with a claim it later asserted, and Anchor Bank was injured as a result. Shelcon filed an unequivocal lien release, which we assume for the sake of argument was an act inconsistent with the later claim of liening the work it had released.[11] Anchor Bank was injured as the result of relying on this act: it loaned $3,900,000 to Haymond as a result of Shelcon's lien release, and Shelcon's later lien filing put Shelcon's claim on the Farm ahead of Anchor Bank's deed of trust in priority.

However, Anchor Bank cannot demonstrate that its reliance was reasonable. It argues that it relied on the lien release as a statement that Haymond had fully paid Shelcon for its outstanding work at the Farm. Anchor Bank also relied upon the invoices showing that work was 100 percent complete for $79,200 worth of work. But Anchor knew that Haymond was in debt; this was the reason he sought financing from Anchor Bank. The trial court found that

---

[11] We do not decide that a lien release is a statement inconsistent with a later filing of a lien including work previously released.

Haymond asked Anchor Bank to increase the loan amount by $300,000.[12] Anchor Bank did not inquire of Haymond or of Shelcon whether Haymond had paid or why he needed the extra $300,000. Instead, Anchor Bank asked Haymond to have Shelcon release its lien and Shelcon did so within days. Given these facts, and given Anchor Bank's knowledge of Haymond's financial situation, Anchor Bank has not shown by clear, cogent, and convincing evidence that it was reasonable to rely on this release as an assertion that Haymond had suddenly paid Shelcon in full for its work on the Farm.[13] In this case, as the trial court concluded, Anchor Bank had the means to discover the true facts, but it failed to do so. *See Concerned Land Owners of Union Hill*, 64 Wn. App. at 778.[14]

Anchor Bank also argues that "when misrepresentations serve to deceive or mislead a party, it is immaterial if investigation would reveal the truth." Br. of Appellant (Anchor Bank) at 43 n. 16 (citing *Hoffer v. State*, 110 Wn.2d 415, 426, 755 P.2d 781 (1988)). But Anchor Bank's

---

[12] Anchor Bank challenges this finding of fact. But as explained above, we do not assess this assignment of error because Anchor Bank challenged the finding only to the extent that we construe it to mean Haymond planned to use the $300,000 to pay Shelcon. Anchor Bank does not dispute that Haymond in fact made this request, nor does it argue that this finding of fact lacks substantial evidence.

[13] We note that Haymond's assertion to Anchor Bank that the $303,291.29 lien on the Farm was a mistake is irrelevant to determining whether Anchor Bank reasonably relied on *Shelcon's* statements.

[14] Anchor Bank argues that the trial court's finding of fact finding no fault with Anchor Bank's protocols is proof that Anchor Bank "reasonably relied on Shelcon's lien release." Br. of Appellant (Sept. 11, 2013) at 42. We disagree. The trial court's same finding of fact goes on to explain the suspicious circumstances Anchor Bank could have investigated. The fact that the trial court found it could not fault Anchor Bank's practices does not mean the trial court found that Anchor did not have the means to discover the truth.

25

cases supporting this argument all come from the context of fraudulent misrepresentation claims. *See* 110 Wn.2d at 425; *Boonstra v. Stevens-Norton, Inc.*, 64 Wn.2d 621, 626, 393 P.2d 287 (1964); *North Pacific Plywood, Inc. v. Access Rd. Builders, Inc.*, 29 Wn. App. 228, 233, 628 P.2d 482 (1981). Here, Anchor Bank argues that estoppel should apply; it makes no fraudulent misrepresentation claim. Moreover, as explained above, the situation arguably portrayed by the lien release—that Haymond had suddenly paid Shelcon in full—could not have actually deceived Anchor Bank, because it was not plausible. *See North Pacific Plywood*, 29 Wn. App. at 233. And because we look only to misrepresentations made by Shelcon, not Haymond, it is irrelevant that Haymond misrepresented to Anchor Bank that the lien was a misunderstanding. Shelcon had no involvement with this misrepresentation. Therefore, we agree with Shelcon that Anchor Bank's reliance was unreasonable in part because it failed to inquire of Shelcon.

Anchor Bank argues that the trial court's conclusions of law are inconsistent with its findings of fact. The trial court found, for example, that Shelcon released its lien with the purpose of enabling Haymond to obtain funding from Anchor Bank and that Shelcon generated statements in its invoices showing that work was 100 percent complete. The trial court also found that Anchor Bank relied on the lien release and that the trial court could not find fault with the Bank or its protocols in loaning $3,900,000 to Haymond. Anchor Bank argues that these findings of fact support only the conclusion that equitable estoppel should apply. As described above, however, these findings of fact demonstrate that, although Anchor Bank may have innocently relied on Shelcon's lien release and invoices, it did not *reasonably* rely on them.

The trial court found that Anchor Bank had failed to prove equitable estoppel. Estoppel is a question for the trier of fact unless only one inference can be drawn from the evidence.

*Colonial Imports*, 121 Wn.2d at 737. Therefore, the trial court's findings of fact, supported by substantial evidence, show that Anchor Bank failed to prove the elements of equitable estoppel by clear, cogent, and convincing evidence.

D.     *First Day of Work*

Finally, Anchor Bank challenges the trial court's determination that Shelcon's first day of work at the Farm for purposes of establishing its lien priority occurred on July 5, 2006. It argues that Shelcon's work on July 5 was not within the scope of "professional services," meaning that Anchor Bank's deed of trust would have priority over Shelcon's lien. Br. of Appellant (Anchor Bank) at 47. We disagree because Shelcon performed work, as defined by the applicable statute, establishing its lien priority before Anchor Bank's predecessor in interest recorded its deed of trust.

By statute, mechanic's liens take priority over any lien, mortgage, deed of trust, or other encumbrance attaching to the land or recorded after the "commencement of labor or professional services or first delivery of materials or equipment by the lien claimant." RCW 60.04.061. Lienable work, including professional services, must be done "for the improvement of real property." RCW 60.04.021. "Professional services" are "surveying, establishing or marking the boundaries of, preparing maps, plans, or specifications for, or inspecting, testing, or otherwise performing any other architectural or engineering services for the improvement of real property." RCW 60.04.011(13). The definition of "improvement" includes, among other things, "providing professional services upon real property or in preparation for or in conjunction with the intended activities" of constructing or landscaping. RCW 60.04.011(5)(c). Therefore, if Shelcon's work

27

on July 5, 2006 involved, among other things, marking boundaries in preparation for construction, then it was lienable and takes priority over a later deed of trust.

Mere preparatory activities alone do not constitute improvement. For example, digging test holes to measure the water level in the anticipation of beginning construction someday does not qualify under the statute as "'improvement.'" *Colorado Structures, Inc. v. Blue Mountain Plaza, LLC*, 159 Wn. App. 654, 663, 246 P.3d 835 (2011). Instead, preparatory work must be done for an immediate purpose of beginning an improvement for lien priority to attach. 159 Wn. App. at 663. Finally, for preparatory work to be lienable it must be "part of a larger, lienable, labor and materials contract." *Pac. Indus., Inc. v. Singh*, 120 Wn. App. 1, 9, 86 P.3d 778 (2003); *see also TPST Soil Recyclers of Washington, Inc. v. W.F. Anderson Const., Inc.*, 91 Wn. App. 297, 302, 957 P.2d 265 (1998).

The work Shelcon did at the Farm on July 5, 2006 consisted of marking the property boundaries to prepare for clearing and grubbing. Later that same day, Anchor Bank's predecessor in interest, Washington First Bank, recorded its deed of trust on the Farm. On July 10 and 11, 2006, Shelcon employees cleared and grubbed the Farm. Marking the property to prepare for clearing and grubbing fits within the statutory definition of professional services for the improvement of real property because they were preparatory work directly in advance of construction work. Just five days after Martin marked the property, his employees returned to do the physical work he had prepared for.

Therefore, Shelcon's work on July 5, 2006, had a close temporal connection with construction work, and was part of an overall lienable scheme. *See Colorado Structures*, 159 Wn. App. at 663. The July 5, 2006 preparatory work was part of Shelcon's overall scheme of

construction at the Farm, and it occurred just days before the construction work began. The trial court properly concluded that Shelcon's work at the Farm on July 5 constituted "professional services" commencing on the land before the deed of trust, and therefore Shelcon's lien took priority over Anchor Bank's deed of trust.

## ATTORNEY FEES

Finally, Shelcon seeks reasonable attorney fees on appeal under its agreement with Haymond. We grant the attorney fees Shelcon requests from Haymond, because Shelcon is the prevailing party and the contract between Shelcon and Haymond provides for attorney fees. Shelcon is also entitled to reasonable attorney fees from Haymond under RCW 60.04.181(3), which provides that the prevailing party in an action to enforce a mechanic's lien is entitled to attorney fees. [15],[16]

Shelcon is entitled to reasonable attorney fees on appeal from Anchor Bank under RCW 60.04.181(3) because its action against Anchor Bank was to enforce a mechanic's lien.

---

[15] RCW 60.04.181(3) provides that the "court may allow the prevailing party in the action . . . as part of the costs of the action, . . . attorneys' fees and necessary expenses incurred by the attorney in the superior court, court of appeals, supreme court, or arbitration."

[16] In the conclusion section of his brief, Haymond requests that we reduce the trial court's award of attorney fees to Shelcon. Haymond neither assigns error to the trial court's award of attorney fees nor provides argument and authorities in support of this request. Accordingly, we do not consider it. RAP 10.3(a)(4), (6); *In re Det. of Brock*, 126 Wn. App. 957, 961 n. 1, 110 P.3d 791 (2005); *Brownfield v. City of Yakima*, 178 Wn. App. 850, 875-76, 316 P.3d 520 (2014).

No. 42845-8-II
Consolidated wi No. 44995-1-II

In summary, we hold that the trial court did not err by awarding Shelcon 18 percent interest, calculating interest, or finding that Shelcon's lien took priority over Anchor Bank's deed of trust. We affirm.

_____
Worswick, P.J.

We concur:

_____
Melnick, J.

_____
Sutton, J.

30