# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TTG, LLC, a Washington limited liability company, | No. 83849-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| ROBERT AKHTAR; and GULNOOR JAHAN-AKHTAR, husband and wife, | |
| Appellants, | |
| TED THOMAS and JANE DOE THOMAS, husband and wife; and DUANE SCHOOLEY, husband and wife, d/b/a FIVE STAR FLOORING, | |
| Third Party Defendants. | |

BIRK, J. — Robert Akhtar and Gulnoor Jahan-Akhtar's home suffered from severe fire and smoke damage. The Akhtars contracted with TTG LLC to commence repair efforts and substantially expand the house. After protracted disputes over payments, progress on the house, and the Akhtars' refusal to sign change orders, TTG terminated its services, recorded a lien against the property, and filed this action. The superior court awarded TTG damages for work the court found TTG had performed for which the Akhtars had not paid, together with prejudgment interest and attorney fees. We remand for recalculation of prejudgment interest, but otherwise affirm and award attorney fees and costs on appeal to TTG.

No. 83849-1-I/2

I[1]

In March 2017, a fire caused extensive damage to the Akhtars' rental property (House) in Bellevue. The Akhtars had insurance coverage with Safeco Insurance Company of America. On April 18, 2017, Safeco preliminarily estimated the total cost of repairs to be $116,006.14. At times during the project, Safeco issued increased estimates based on items of work not contemplated in its earlier estimates. The Akhtars had a mortgage through Chase Bank. Safeco paid the insurance proceeds for repair and restoration to Chase. Chase released funds based on the percentage of work completed. A Chase inspector reviewed the percentage of completion of the work done and determined the amount Chase would disburse.

The Akhtars contacted Ted Thomas, owner of TTG, about performing repairs. The parties discussed the Akhtars' desire to construct additions to the House that would significantly increase its size. In late June 2017, the parties agreed to have TTG begin demolition to explore the extent of the fire damage. TTG obtained a permit from the City of Bellevue and removed obviously destroyed parts of the House. TTG submitted a demolition invoice to the Akhtars for $13,514.00, which the Akhtars paid in full. TTG discovered additional required repairs not included in Safeco's initial estimates.

On July 1, 2017, TTG provided Akhtar with a written proposal, which included all work itemized on Safeco's estimate. On July 5, 2017, Akhtar executed

---

[1] We incorporate unchallenged findings of fact which are accepted as true on appeal. In re Det. of L.S., 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

2

a contract with Thomas's company IOAP, LLC, to prepare the design for the House expansion.

Thomas testified his initial repair estimate was $156,104.00. On July 19, 2017, TTG sent a revised estimate, signed and dated by Thomas, to Akhtar for $137,016.00. Thomas testified he revised the estimate to match Safeco's then current estimate being held by Chase. Thomas did not believe the repairs could be accomplished for that amount, but anticipated further discussion of open line items with Safeco. In August, TTG sent a letter with the same revised estimate, again signed by Thomas on behalf of TTG. On or about August 14, 2017, TTG prepared a proposed written construction agreement (Contract), which listed TTG as the contractor and a total price of $137,016.00, and e-mailed it to Akhtar. The contract price equaled Safeco's then current estimate. Article 5 of the Contract provided, "All change orders shall be in writing and signed both by Owner and Contractor, and shall be incorporated in, and become part of the contract." Article 5 further provided, "Contractor may suspend work on the job until such time as all payments due have been made. A failure to make payments for a period in excess of 20 days from the due date of the payment shall be deemed a material breach of this contract." While Akhtar never signed the Contract despite telling Thomas he would, Akhtar's subsequent actions manifested his assent to the Contract.

After TTG commenced work under the Contract, it again discovered additional required repairs and code upgrades not included in Safeco's initial estimates. In March 2018, Safeco increased its estimate to $185,611.37.

3

On or about April 2, 2018, the parties signed a written amendment (Amendment) to the Contract. The Amendment increased the Contract price to $185,000.00. It established a payment schedule pursuant to which the Akhtars paid TTG $22,500.00. Paragraph 18 of the Amendment permitted the Akhtars to order additions, deletions or modifications to the work, and the Akhtars agreed to make corresponding, applicable adjustments to the Contract price and time of completion. All changes "will be authorized in a written 'Change Order' signed by Owner and Contractor." TTG would be permitted to recover, among other things, payment for all work completed.

Per the Amendment's terms, the parties agreed the Akhtars' next payment would become due when the project was at 70 percent completion. On September 6, 2018, the Akhtars paid $45,195.01 for the 70 percent project completion payment. The Akhtars' payments to TTG totaled $130,044.46. The final payment was due on completion.

The Akhtars requested TTG perform additional work outside the scope of the Contract and Amendment. The scope of the work and TTG's pricing for the Akhtars' requests were generally described in six change orders. TTG asked Akhtar to sign the change orders, but he never did and instead stated that he wanted to sort them out after TTG completed all of its work on the project.

TTG attributed project delays to the time it took the City of Bellevue to provide permitting, the Akhtars' changing intentions for the scope of work, and a setback issue that arose when Akhtar mistook the location of his lot line, among other things. TTG viewed certain change orders as impacting the ability to proceed

4

with the project. TTG declined to do additional work and work out payment terms only later.

TTG ceased its project work in April 2019. That month, Chase's inspector valued the total loss amount at $205,798.08. Chase's inspector estimated the work was 45 percent complete. TTG estimated the work was at least approximately 70 percent complete. On April 9, 2019, TTG recorded a claim of lien pursuant to chapter 60.04 RCW against the property.

On May 23, 2019, TTG filed a lawsuit against the Akhtars alleging breach of contract and requesting foreclosure of its lien. The Akhtars pleaded affirmative defenses, added Thomas and another party as third party defendants, and counterclaimed for breach of contract and violations of the Washington Consumer Protection Act, chapter 19.86 RCW. The Akhtars later added several affirmative defenses and a counterclaim for fraud.

Following a bench trial, the superior court found in favor of TTG and against the Akhtars. TTG's further performance was deemed excused by the Akhtars' refusal to sign the change orders. The court calculated the Akhtars owed TTG $14,014.20, which was determined by taking 70 percent of $205,798.08 and subtracting the Akhtars' payments. The court awarded TTG prejudgment interest, reasonable attorney fees, and a decree of foreclosure. The court rejected the Akhtars' counterclaims, but ordered TTG to return appliances that the Akhtars had purchased and TTG had stored and later withheld. The court entered final judgment in the amount of $52,466.14. The Akhtars appeal.

5

II

A

We first consider the Akhtars' challenge to several findings of fact concerning their failure to execute change orders. Findings of fact are reviewed for substantial evidence. Real Carriage Door Co., Inc. ex. rel. Rees v. Rees, 17 Wn. App. 2d 449, 457, 486 P.3d 955, review denied, 198 Wn.2d 1025, 497 P.3d 394 (2021). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978). On substantial evidence review, all evidence is construed in favor of the prevailing party. Mangan v. Lamar, 18 Wn. App. 2d 93, 95, 496 P.3d 1213 (2021). We do not review the trial court's credibility determinations on appeal. Columbia State Bank v. Invicta Law Grp. PLLC, 199 Wn. App. 306, 319, 402 P.3d 330 (2017).

The Akhtars challenge the findings to the effect the Contract required them to sign written change orders. The crux of their argument rests on a challenge to findings of fact 17 and 21, which stated,

> 17.  The original contract (Exhibit 1) and the Amended Contract (Exhibit 2) both required that change orders be signed by both Mr. Thomas (or TTG) and the Akhtars. Paragraph 18 of the Amendment required this by stating: "All changes will be authorized in a written "Change Order" signed by Owner and Contractor, which shall be incorporated by reference herein." Article 5 of the original contract, Exhibit 1, also required that any changes to the scope of work be signed when it specified that any changes in the scope of work be done "only upon written order for the same, signed by Owner and Contractor."
>
> . . . .

6

21.    Mr. Akhtar did not sign any of the Change Orders though, and instead stated that he wanted to sort them out after TTG completed all of its work on the project.  Mr. Akhtar's position was not supported by the terms of the Amendment.  The Akhtars' wrongful refusal to sign any of TTG's Change Orders was a material breach of the Amendment and the Contract and excused TTG from performing any further work on the Akhtars' project.

The Akhtars challenge aspects of other findings.  Finding of fact 20 states TTG performed "almost all of the work identified in TTG's Change Orders."  Finding of fact 27 states the court found the Contract required the parties to execute change orders "to address any issues in the project," and the Akhtars could not defer executing change orders in " 'good faith' " until after the project's completion.

Substantial evidence supports the superior court's findings that the Akhtars refused to execute written change orders and that their failure to do so was not consistent with the Contract.  Article 5 of the Contract referenced in finding of fact 17 indicated that following a written change order, "if there is any charge for such alteration or deviation, the additional charge will be added to the contract price . . . . If payment is not made when due, Contractor may suspend work."  The Contract permitted the Akhtars to order changes to the work, provided they agreed to make corresponding, applicable adjustments to the price and time of completion.  Changes were to be memorialized "in a written 'Change Order' signed by Owner and Contractor."  In several e-mails from February and March 2019, Thomas sent Akhtar the change orders stating, "We need to get these signed and 50 percent payment [as soon as possible]," and "[t]here is payment required to make all of this happen."  Thomas disputed the Akhtars' claims that the work items outlined in the change orders were already contemplated in the Contract or Amendment, and

noted their proposal to analyze the change orders on a need basis "will continue to delay construction completion as noted in the change Orders as previously submitted" and "[t]he Change Orders are to be executed and a partial payment made know [*sic*] before any further work progress's [*sic*]."

The contractual provisions for change orders to be in writing, and permitting TTG to suspend work in case of nonpayment, support the superior court's finding of fact 17 that TTG was entitled to require that changes to the work be established in written change orders with agreed adjustments to price. They further support the portion of finding of fact 27 that notes TTG was not required to acquiesce to the Akhtars' stated preference to agree on a price adjustment only after TTG's completion of the work, and that the Akhtars' position in this regard "was not supported by the terms of the Amendment."

B

The Akhtars challenge the superior court's conclusion of law 4 that "[t]he Akhtars breached the Contract and the Amendment by refusing to sign TTG's Change Orders," and that TTG's further performance was excused by their failure to do so. Where findings of fact after a bench trial are supported by substantial evidence, we consider whether they support the trial court's conclusions of law. Real Carriage Door, 17 Wn. App. 2d at 457. The Akhtars argue they did not agree to change the Contract, and their failure to sign change orders with which they did not agree was not a breach. We agree with the superior court, however, their refusal to execute written change orders with agreed price adjustments excused TTG's further performance.

8

In an analogous case, a prime contractor sought a contract modification with CKP, its grading subcontractor, based on revised grading plans which "would have required virtually all of the installed utilities to be adjusted." CKP, Inc. v. GRS Const. Co., 63 Wn. App. 601, 605, 821 P.2d 63 (1991). When the prime contractor and CKP were unable to agree on change orders, the prime contractor "threatened to withhold payment unless CKP agreed to terms it proposed." Id. CKP did not agree and terminated its work. Id. We held the prime contractor repudiated the contract, excusing CKP's further performance. Id. at 620. We explained the rule:

> Repudiation of a contract by one party may be treated by the other as a breach which will excuse the other's performance. Whether facts have been established showing repudiation is a question for the finder of fact. An intent to repudiate may be expressly asserted or circumstantially manifested by conduct. Hemisphere Loggers & Contractors, Inc. v. Everett Plywood Corp., 7 Wn. App. 232, 234, 499 P.2d 85, review denied, 81 Wn.2d 1007 (1972). An anticipatory breach occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time for performance. The law requires a positive statement or action indicating distinctly and unequivocally that the repudiating party will not substantially perform his contractual obligations. Lovric v. Dunatov, 18 Wn. App. 274, 282, 567 P.2d 678 (1977).

Id. We held CKP was justified in terminating its work because the prime contractor had "repeatedly threatened to withhold payment from CKP unless it signed contract modification 2," and this "was a repudiation" and "an anticipatory breach" of the contract. Id.

Here, the superior court's unchallenged findings as well as those we have found supported by substantial evidence establish the Akhtars requested TTG to perform additional work not within the scope of the Contract. TTG's pricing for this

work was described in the six change orders, and the Contract called for change orders to be memorialized in writing. This would incorporate change orders into the Contract, and bring them within the other established contractual terms, relevant here the Akhtars' duty to make timely payment and TTG's right to cease working if they did not do so. The Akhtars did not sign the change orders, expressing a preference to settle after TTG had completed the work. Like the prime contractor's refusal to pay in CKP, the Akhtars' refusal to sign the change orders was a refusal to agree to TTG's pricing and terms. The findings support the superior court's conclusion of law 4 that "TTG's performance under [the] Contract and Amendment was excused by the Akhtars' refusal to sign the Change Orders."

III

The Akhtars further challenge the superior court's calculation of the amount due to TTG, and its award of prejudgment interest.

A

Finding of fact 19 states that by September 2018, the project had reached 70 percent completion. Finding of fact 20 states TTG performed almost all of the work identified in TTG's change orders. Finding of fact 22 states the mortgage lender's inspector valued the total loss at $205,798.08. It states further that based on the parties' having had the intent to match Safeco's total loss amount, the "total contract price" including all change orders totaled $205,798.08.

Thomas testified TTG performed 70.5 to 71 percent of the work on the contract line items, and "[a]pproximately 75 to 80 percent" of work under change orders 1-6. Exhibit 113 is the mortgage lender's inspection report that estimated

the total loss amount to be $205,798.08 and approximated the work done to total 45 percent. Although the superior court cited Exhibit 113 to conclude the aggregate contract value including all change orders totaled $205,798.08, that did not also require the superior court to accept its statement TTG completed 45 percent of the project. Substantial evidence supports the superior court's findings concerning the percentage of the work completed and the value of the work.

These findings support the superior court's calculation of the amount due to TTG. Given the total value of the work of $205,798.08, and given TTG's completion of 70 percent of the work, the value of TTG's work was $144,058.66. After crediting the Akhtars' total payments of $130,044.46, the superior court concluded the amount due to TTG was $14,014.20. The superior court's conclusion of law 3 is supported by the findings of fact. The Akhtars argue that the superior court was obligated to calculate TTG's damages based on valuing allegedly incomplete line items in Safeco's final estimate. They base this argument on contract terms contemplating that the parties would use Safeco's line items for pricing and for adjustments in the event of the work deviating from those line items.

The measure of the money damages remedy for breach of contract is designed to give the non-breaching party " 'the benefit of [the] bargain' " by awarding a sum of money that will, to the extent possible, put the non-breaching party " 'in as good a position as [it] would have been in had the contract been performed.' " Eastlake Const. Co., Inc. v. Hess, 102 Wn.2d 30, 46, 686 P.2d 465 (1984) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. a, at 112 (1981)). In case of a construction contract, this can be measured in more than one

way, one of which is " 'the difference between the values to [the non-breaching party] of the finished and the unfinished performance.' " Id.at 47 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c, at 121). The superior court's determination of damages was appropriate.

B

Under conclusion of law 5, the superior court awarded prejudgment interest from April 9, 2019, the date of TTG's lien. We reverse this award in part, because only a portion of the superior court's damages award was liquidated. Prejudgment interest is available only when a claim is "liquidated," which means the claim is in an amount capable of determination without opinion or discretion. Austin v. U.S. Bank of Wash., 73 Wn. App. 293, 312-13, 869 P.2d 404 (1994). When a contract provides for a fixed price, a claim on the contract is liquidated notwithstanding a dispute about the percentage of completion. CKP, 63 Wn. App. at 614. Here, the parties agreed on a contract price of $185,000 for the original scope of work, and this amount is liquidated.

However, the parties never agreed on a price for the change order work, and the superior court's findings refer to the pricing stated in the change orders only as "TTG's pricing." As stated in CKP, items "reduced to definite sums in contract modification orders signed by both parties . . . represent liquidated amounts to which prejudgment interest may be applied." 63 Wn. App. at 617. In contrast, for "extra work . . . not reduced to written contract modifications executed by both parties," but rather "proved by testimony, job diaries, and other such documents," recovery is in quantum meruit. Id. CKP relied on Modern Builders,

12

Inc. of Tacoma v. Manke, 27 Wn. App. 86, 91, 93-95, 615 P.2d 1332 (1980), in which we held the proper measure of damages for "extra work" incurred outside an express contract is a quantum meruit recovery for costs and a reasonable profit. "Quantum meruit may substitute for the contract price and form the basis of total recovery only when substantial changes occur as work progresses which are not covered by the original contract and which were not within the contemplation of the parties when the contract was formed." Id. at 93-94. Changes and modifications agreed to by the parties may be recovered in quantum meruit in addition to the contract price if that work qualifies as "extra work" arising outside and independent of the contract. Id. at 95.

Quantum meruit awards are unliquidated and may not be the basis of an award of prejudgment interest. CKP, 63 Wn. App. at 615. In Manke, the court held the trial court erred by awarding prejudgment interest because "prejudgment interest may not be awarded when a labor and materialmen's lien is set by quantum meruit." 27 Wn. App. at 96. In CKP, also, the court held the trial court erred in awarding prejudgment interest on unliquidated quantum meruit recovery. 63 Wn. App. at 618. Accordingly, to the extent the superior court's damages award, which we affirm, represented compensation for work within the scope of the contract, the award is liquidated and the award of prejudgment interest was appropriate. To the extent the damages award represented compensation for work within the scope of the unsigned change orders, the award was unliquidated and the award of prejudgment interest was error.

13

The superior court's running interest from the date of the lien was appropriate. TTG did not prove, and the superior court did not find, a date by which payment was due either for the unfinished contract work or the change order work. The Contract and Amendment terms are inconclusive on that point, in that they in some cases suggest payment was due within 20 days of billing, and in other cases pursuant to a payment schedule, the final payment of which never came due because completion was not reached. Authority supports that in the absence of proof of an earlier payment date, interest runs from the date of a valid lien. See Shelcon Constr. Grp., LLC v. Haymond, 187 Wn. App. 878, 896, 351 P.3d 895 (2015). By the time of TTG's lien, it had performed the work at issue, and the Akhtars had by their actions excused TTG's further performance. In these circumstances, interest on liquidated amounts was appropriately run from the date of the lien.

IV

Both parties request reasonable attorney fees and costs on appeal. The Amendment contains an attorney fees provision, which provides, "If either Party brings legal action to enforce its rights under this Amendment, the prevailing party will be entitled to recover from the other Party its expenses (including reasonable attorneys' fees and costs) incurred in connection with the action and any appeal." Too, RCW 60.04.181(3) authorizes courts to allow the prevailing party in a construction lien action, "the moneys paid for . . . attorneys' fees and necessary expenses incurred by the attorney in the superior court[ or] court of appeals" as the court deems reasonable. We grant TTG's request for its reasonable attorney

fees and costs on appeal under the contract and RCW 60.04.181(3), and we deny the Akhtars' request for its reasonable attorney fees. TTG is further award statutory costs under RAP 14.2.

We reverse in part and remand solely on the issue of segregating that part of the damage award on which prejudgment interest is allowed from that part on which such interest is not allowed, as set forth in this opinion, and for recalculation of prejudgment interest accordingly. We otherwise affirm.

Birk, J.

WE CONCUR:

Díaz, J.

Dwyer, J.