98 P.3d 491 (2004)
ELLIOTT BAY SEAFOODS, INC., Appellant,
v.
The PORT OF SEATTLE, Respondent,
ABC Corporations I-V, and John Does I-X, Defendants.
No. 52842-4-I.
Court of Appeals of Washington, Division 1.
July 12, 2004.
Publication Ordered August 25, 2004.
*492 William T. McKay, Luanne Perry, McKay Huffington PLLC, Seattle, for Appellant.
Katherine See Kennedy, Danielson Harrigan et al, Timothy George Leyh, Craig Richard Watson, Seattle, for Respondent.
While parol, extrinsic or collateral evidence may be heard to explain the context and intent of the parties in entering into a written contract, it will not be heard to modify, contradict, add to, or vary the terms of that written agreement. Here the written agreement is a lease between Elliot Bay Seafoods, Inc. (EBS) and the Port of Seattle for retail space at the Bell Street Pier (also known as Pier 66). The terms of the lease did not obligate the Port to develop the pier in accordance with any particular concept. Moreover, while there is ample evidence of the Port's intent and desire to develop the pier as a working fishing pier attractive to tourists, there is no evidence that the Port made any commitment or promise to EBS that would support an action for breach of that promise. Finally, there is no evidence that the Port conveyed false information to EBS, negligently or otherwise. What the parties hoped would happen simply did not. That unfortunate turn of events does not support the claims asserted by EBS. The trial court's dismissal of those claims is affirmed.

FACTS
In 1991 the Port adopted a comprehensive scheme of harbor improvements including the redevelopment of Piers 64, 65 and 66. In 1995, the Port announced the development of Bell Street Pier (Pier 66) as a "mixed-use" or working fishing pier that would include a maritime museum, conference center, fish processing, boat moorage, cruise ship terminal and various retail facilities. The Port envisioned the pier becoming a tourist attraction similar to Fisherman's Wharf in San Francisco.
The Port's multi-use plan for Pier 66 included a fish processing facility that would co-exist with a home port cruise terminal. Because long-standing attempts to secure a contract as a home port had not been successful, the focus of the project in this early stage was not the home port. However, there is no dispute that the plans for the Bell Street Pier project included reserving space for a future cruise ship terminal if a home port contract with a cruise line ever came to fruition.
In early 1995, EBS began its search for new office space for its fish brokerage business. It became aware of the Bell Street Pier through the Port's marketing efforts, newspaper articles, and signage on the newly-built facility on the pier. It is undisputed that the Port told EBS and its leasing agent that plans for the development of the pier included a working fishing pier concept. Before *493 signing two leases, one for office space and one for retail space, EBS was told that the Port was in final negotiations with "The Fishin' Place" for an interactive exhibit space as well as actual fish processing. The focus of the discussions between EBS and the Port was on the fishing industry and accompanying tourist activity, a fact not disputed by the Port.
In early 1996, the Port entered into a lease agreement with Oceantrawl, Inc., d/b/a "The Fishin' Place," to run a processing plant and retail store. The Port also negotiated a lease with Polare, another marine industry store selling fishing gear and clothing.
EBS was enamored with the plans for the mixed-use project. Initially, EBS was interested only in office space for its wholesale fish brokerage business, but during the course of discussions with the Port, EBS warmed to the idea of opening a retail seafood store. Lease negotiations ensued and a lease for office space was signed in June 1996. A 20-page retail commercial lease for the Bell Street Pier Fish Market was signed in August 1996. The lease required EBS to open the fish market for business by November 1, 1996. EBS was diligent in its efforts to open, spending approximately $400,000 constructing its store and purchasing necessary equipment and appliances. The retail store timely opened.
The Fishin' Place was scheduled to open by December 31, 1996, but it did not. It became embroiled in a dispute with various contractors and the Port, and repeatedly changed its designs and plans. EBS claims that part of this problem should be laid at the feet of the Port. Although The Fishin' Place never opened for business, it paid the base rent required in its lease to the Port for a couple of years while working on plans to open. During this time, the Port continued to believe The Fishin' Place would open and provided updates to EBS regarding the ongoing attempts to get it open.
Due to labor-management issues with the longshoremen's union, there was a problem with the logistics of unloading fishing boats at the pier. During the time EBS's retail store remained open, no commercial or tribal fishing boats used the pier as hoped by the Port and set forth in its plan. Eventually those issues were settled, and fishing boats do occasionally tie up at the facility, as do pleasure boats and cruise ships.
In the spring of 1998, Polare, the only other retail store in the building EBS occupied, closed. EBS's Fish Market remained the only open store in the building from that time until it closed in May of 1999.
In late 1998, the Port reached an agreement with Norwegian Cruise Lines (NCL) to provide a home port. After obtaining the NCL contract, the Port began the design process for the new terminal. Originally the Port had hoped to design the new terminal in conjunction with The Fishin' Place, but soon discovered that it would need more space at the pier due to the larger ships. Because The Fishin' Place was not yet open, and there were still problems with the design of that space, the Port terminated The Fishin' Place's lease. In early 1999, the Port told EBS The Fishin' Place's lease had been terminated and that the Port was going to incorporate that space into the cruise ship terminal. At that time, the Port also explained its construction plans. The Fish Market was going to be surrounded by heavy construction for a number of months. EBS believed that the Port was abandoning its mixed-use plan and that it would concentrate only on the home port cruise ship business. EBS agrees that the Port attempted to convince it that a cruise ship terminal would bring substantial revenues to the Fish Market because of all the people embarking and disembarking. EBS claims its studies indicated otherwise. EBS determined that the change in the Bell Street Pier from a mixed-use, working fishing pier to a premier cruise ship terminal was not conducive to its business. In May 1999, EBS closed the Fish Market. That fall, despite showing a lucrative balance sheet in its wholesale business, the entire company went out of business, allegedly due to the financial drain from the retail business.
In November 2001, EBS sued the Port for breach of contract including, but not limited to, the obligation of good faith and fair dealing on both the retail lease and the office *494 lease. It also claimed damages as the result of the Port's fraud, intentional and negligent misrepresentation, and sought damages under a theory of promissory estoppel.[1]
In April 2003, EBS brought a motion for partial summary judgment alleging that the Port breached the retail lease when it failed to develop the pier as represented to EBS, as well as the fact that the Port unilaterally changed the development plan for the pier. EBS claimed the retail lease was not a fully integrated agreement and, even if it was, parol evidence was admissible to determine the parties' intent in forming the contract. EBS sought a determination as a matter of law that the Port breached the retail lease as well as its duty of good faith and fair dealing under the lease.
A week later, the Port brought a cross-motion for summary judgment as to the claim for breach of the retail lease, and further moved to dismiss all remaining claims asserted against it by EBS.
Finding no material issues of fact, the trial court granted both of the Port's motions for summary judgment and denied EBS's motion for partial summary judgment. EBS appeals.

DECISION
Breach of the retail lease.[2] At summary judgment EBS stated that the retail lease should be construed and interpreted to include the Port's "undisputed promises" to develop a mixed-use, working, fishing-industry related pier. EBS claims that the Port's failure to develop the pier in this manner was a breach of the lease. On appeal EBS states the claim slightly differently, claiming the issue before the trial court was to determine the meaning attached to the agreement by the parties of the use of the term "Bell Street Pier project" and its reference to "pier side construction." Although the terminology used is different, the claim is basically the same  that the Port's failure to develop the Bell Street Pier in the manner allegedly promised to EBS is a breach of the lease or, as discussed later, a breach actionable under the doctrine of promissory estoppel.
EBS cannot point to any specific provision of the lease that was breached by the Port. It cannot show the breach of any duty owed to EBS in the lease by the Port. The lease did not contain any express promises or covenants requiring the Port to build the pier project as envisioned. No extra-contractual promise can be implied to guarantee a fish processing facility or maintain any particular mix of tenants at Pier 66 when that issue was not addressed in any term of the lease.[3] While the Fuller Market Basket case was decided before Berg v. Hudesman,[4]Berg and its progeny would not change the result here. Berg held that extrinsic evidence may be admitted to give meaning to the words used in the contract, not to create a new contract term. There was no breach of the lease.

Promissory Estoppel
Promissory estoppel renders a promise made without consideration enforceable.[5] There are five prerequisites for recovery in promissory estoppel: (1) A promise that (2) the promisor should reasonably expect *495 to cause the promisee to change his position and (3) that does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.[6]
Obviously, promissory estoppel requires a promise.[7] A promise is
"a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1); see § 90 cmt. a (referring to promise definition in § 2).[8]
Although promissory estoppel may apply in the absence of consideration, the doctrine may not be used as a way of supplying a promise.[9]
EBS argues there are genuine issues of material fact regarding whether the Port should be estopped from denying the promise that Pier 66 would be developed as a mixed-use pier including a fish processing facility. But the Port's expression of its vision of the pier project was not a legally binding promise. A statement of future intent is not sufficient to constitute a promise for the purpose of promissory estoppel. An intention to do a thing is not a promise to do it.[10]
EBS urges the court to reject Meissner and Pacific Cascade and apply the reasoning of Klinke. But in Klinke the issue was whether promissory estoppel should be applied to enforce an agreement to make a written agreement notwithstanding the statute of frauds. Unlike the case before the panel, the plaintiffs in Klinke were not asking the court to make a defendant a guarantor of future events that it could not control. Here, the trial court properly found no genuine issues of material fact regarding EBS's claim of promissory estoppel because there was no promise made.

Negligent Misrepresentation
Washington has adopted the Restatement (Second) of Torts with respect to the elements of negligent misrepresentation:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.[11]
EBS argues that the Port's representations were "negligently obtained or communicated" under the reasoning of the recent cases of Lawyer's Title v. Baik[12] and ESCA Corp. v. KPMG Peat Marwick.[13] But each of those cases required negligence in obtaining or communicating false information. Here EBS has presented no evidence that any information communicated by the Port to EBS in 1995-96 was false. In a claim for negligent misrepresentation the plaintiff must prove the defendant made a false statement by clear, cogent, and convincing evidence.[14] EBS fails to offer proof that any of the statements made by the Port were false. Reasonable minds cannot differ regarding the Port's intent in 1995-96, (1) to *496 create a mixed-use pier with water-dependent users including fishing vessels and fish processing; or (2) to obtain a home port contract. EBS's claim for negligent misrepresentation is defective because it cannot prove the falsity of the Port's claims. Therefore the trial court did not err in granting summary judgment on this issue.
The Port seeks attorney fees and costs both in the trial court and in this court. The retail and office leases contain attorney fees provisions. However, the Port failed to ask for attorney fees below and therefore has waived that claim. But the Port remembered to request attorney fees here and under the lease the Port is entitled to them.
The trial court is affirmed and the Port is awarded its reasonable attorney fees on appeal.
KENNEDY and APPELWICK, JJ., concur.
NOTES
[1] EBS later took a voluntary non-suit as to its claims for fraud and intentional misrepresentation.
[2] In reviewing a grant of summary judgment, an appellate court engages in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). We review the motion for summary judgment de novo, and treat all facts and inferences therefrom in a light most favorable to the nonmoving party. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56(c). Where reasonable minds could reach but one conclusion from the admissible facts in evidence, summary judgment should be granted. LaMon v. Butler, 112 Wash.2d 193, 199, 770 P.2d 1027 (1989).
[3] See Fuller Market Basket, Inc. v. Gillingham & Jones, Inc., 14 Wash.App. 128, 134, 539 P.2d 868 (1975).
[4] Berg v. Hudesman, 115 Wash.2d 657, 801 P.2d 222 (1990).
[5] King v. Riveland, 125 Wash.2d 500, 506, 886 P.2d 160 (1994).
[6] King, 125 Wash.2d at 506, 886 P.2d 160, citing Corbit v. J.I. Case Co., 70 Wash.2d 522, 539, 424 P.2d 290 (1967); see also Restatement (Second) of Contracts § 90 (1981).
[7] Klinke v. Famous Recipe Fried Chicken, Inc., 94 Wash.2d 255, 259, 616 P.2d 644 (1980).
[8] Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 172, 876 P.2d 435 (1994).
[9] Havens, 124 Wash.2d at 173, 876 P.2d 435.
[10] Pacific Cascade Corp. v. Nimmer, 25 Wash.App. 552, 556, 608 P.2d 266 (1980), citing Meissner v. Simpson Timber Co., 69 Wash.2d 949, 957, 421 P.2d 674 (1966).
[11] Restatement (Second) of Torts § 552(1) (1997) (emphasis added).
[12] Lawyer's Title Ins. Corp. v. Baik, 147 Wash.2d 536, 55 P.3d 619 (2002).
[13] ESCA Corp. v. KPMG Peat Marwick, 135 Wash.2d 820, 959 P.2d 651 (1998).
[14] Trimble v. Washington State University, 140 Wash.2d 88, 97, 993 P.2d 259 (2000).