# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PUT A BIRD ON IT, LLC, a Washington Limited Liability Company, d/b/a ARROWFISH CONCEPTS,<br><br>Appellant,<br><br>v.<br><br>SEATTLE ARENA HOLDINGS, LLC, a Delaware Limited Liability Company; SEATTLE AREA COMPANY, LLC, a Delaware Limited Liability Company; SAH HOLDINGS, LLC, a Delaware Limited Liability Company; SAH BRESSI LANDLORD, LLC, a Delaware Limited Liability Company; SAH BRESSI INVESTMENT, LLC, a Washington State Limited Liability Company,<br><br>Respondents. | No. 87756-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — Put A Bird On It LLC d/b/a Arrowfish Concepts (Arrowfish) appeals the trial court's CR 12(b)(6) ruling dismissing Arrowfish's breach of contract, breach of the duty of good faith and fair dealing, breach of implied-in-fact contract, promissory estoppel, and unjust enrichment claims against Seattle Arena Holdings, LLC (SAH), Seattle Arena Company, LLC (SAC), SAH Bressi Holdings, LLC (SAH Bressi Holdings), SAH Bressi Landlord, LLC (SAH Bressi Landlord), and SAH Bressi Investment, LLC (SAH Bressi Investment) (collectively the SAH Defendants). Finding no error, we affirm.

I

Because Arrowfish assigns error to the trial court's dismissal of its claims against the SAH Defendants under CR 12(b)(6), the following statement of facts accepts as true the allegations contained in the complaint. *See Tang Real Estate Invs., Corp. v. Escrow Servs. of Wash.,* 30 Wn. App. 2d 602, 604, 546 P.3d 453 (2024). We also consider and describe several documents that were referenced in the complaint. *See Watkins v. ESA Mgmt., LLC*, 30 Wn. App. 2d 916, 921, 547 P.3d 271 (2024) (in ruling on a motion to dismiss, courts may consider documents not physically attached to the pleading whose contents are alleged in a complaint).

Arrowfish is a Seattle-based company specializing in concept development, innovation, and brand development. In November 2020, Arrowfish met with representatives of SAH. SAH is a company owned, operated, and managed by owners of the Seattle Kraken and members of Oak View Group (OVG), a global sports and entertainment development and investment company. During the meeting, representatives of Arrowfish and SAH discussed entering a partnership to develop a large format "eatertainment" venue, which would later be called "Bressi Garage," in a building located near Climate Pledge Arena in Seattle, Washington. By December 2020, SAH had approved Arrowfish's work on the Bressi Garage project, and the parties began drafting a Memorandum of Understanding (MOU). In June 2021, after several months of negotiations, Arrowfish and SAH executed the MOU.

The MOU was effective as of June 22, 2021, and was "intended to document the proposed strategic partnership between [SAH] and [Arrowfish]." The

MOU states that the "[p]arties intend to rely on this MOU as a framework document" and that the "[p]arties agree that this MOU will serve as a non-binding understanding of the intent of the Parties and negotiations towards definitive documentation will commence in good faith upon the execution of this MOU." Following execution of the MOU, Arrowfish "dedicated all of its resources to working on the Bressi Garage project," performing work such as fundraising, designing brand assets, licensing efforts, marketing, and building a proprietary technology platform. Additionally, in consultation with or at the direction of the SAH Defendants, Arrowfish hired numerous third parties and vendors to work on the Bressi Garage project.

Throughout the next three years, Arrowfish and the SAH Defendants worked to prepare and execute various agreements "meant to memorialize the nature and scope of the Bressi Garage project." There were five agreements that involved several different parties that Arrowfish and the SAH Defendants collectively referred to as the "Bressi Agreements." The Bressi Agreements included a Limited Liability Agreement of Bressi Garage LLC (Operating Agreement), a Site Development and Work Letter Agreement (Site Development Agreement), a Lease Agreement, a Sublease Agreement, and a Facility Management Agreement (Management Agreement). As discussed below, each of these documents varied in level of execution and completion.

After they executed the MOU, the parties drafted the Operating Agreement. The terms of this agreement listed the members of Bressi Garage LLC as SAH Bressi Investment, Arrowfish, and Columbia Hospitality Inc. (CHI). When the

parties were negotiating the terms to the Operating Agreement, the SAH Defendants "suddenly sent a dramatically marked up version" of the Management Agreement to CHI, which was originally intended to assist with the hospitality and management operations of Bressi Garage. When the parties could not agree on the terms of the updated Management Agreement, the SAH Defendants "effectively pushed out CHI as Arrowfish's operating partner for the Bressi Garage." The SAH Defendants, "who were managed by OVG, then installed OVG's own hospitality and management division, Oak View Group Hospitality" (OVGH), as the Bressi Garage operating partner. Thus, CHI did not sign the Operating Agreement, and Arrowfish and the SAH Defendants never signed or circulated a new draft of the Operating Agreement replacing CHI with OVGH. Additionally, the Management Agreement remained in a heavily redlined draft version and was never signed by any party.

Though the SAH Defendants' conduct was "distressing to Arrowfish," the project moved forward and "Arrowfish and the SAH Defendants ultimately agreed to execute the Management Agreement." "Arrowfish was repeatedly assured by the SAH Defendants that they 'remained very excited to work with Arrowfish'" and the parties met in November of 2023 to discuss plans for further business opportunities. Arrowfish then "resumed its day-to-day duties, which included continued fundraising efforts, further build-out of the technology and concept, and other Bressi Garage project related tasks." When Arrowfish repeatedly followed up with the SAH Defendants about the final execution of the remaining documents, they were assured "everything was fine, and the documents would be executed in

short order." The SAH Defendants indicated that "[a]ll is good, we are just waiting for a couple of final approvals."

The three remaining Bressi Agreements also varied in level of execution. To be effective, the Lease Agreement, which included an initial term of ten years, required the "full execution and delivery of this Lease by Landlord and Tenant" and the "full execution and delivery" of the Operating Agreement, the Site Development Agreement, and the Management Agreement, all by 5:00 p.m. PDT on November 30, 2023. But the Lease Agreement was never signed by any party. And although the Site Development Agreement was signed by all parties to the agreement, its terms similarly stated the agreement would become effective after a lease agreement was executed and delivered, which never happened. Lastly, the Sublease Agreement, an agreement between SAC and SAH Bressi Landlord, was never signed by either party.

Before the Bressi Agreements were finalized, the SAH Defendants learned that Tom's Watch Bar, a national sports bar chain, intended to open a competing business across the street from Bressi Garage. The SAH Defendants began having conversations with Tom's Watch Bar, including discussions about Tom's Watch Bar taking over the Bressi Garage site. After "months of radio silence," Arrowfish became frustrated with the SAH Defendants' lack of responsiveness. In late March of 2024, Arrowfish asked the SAH Defendants for an update on the finalized documents. In April 2024, SAH terminated its business relationship with Arrowfish. After Arrowfish requested an explanation, a representative of the SAH Defendants explained that "[w]e had OVG here yesterday and it looks like full focus

on Tom's Watch Bar. . . [t]he rational[e] provided for the change was 'meaningful competitor across the street eliminated . . . less ambitious but very positive relationship with Arrow Fish and our support for the concept going forward.'"

On October 18, 2024, Arrowfish filed a complaint alleging five causes of action: breach of contract, breach of the duty of good faith and fair dealing, breach of implied-in-fact contract, promissory estoppel, and unjust enrichment. The SAH Defendants filed a Motion to Dismiss under CR 12(b)(6), arguing that this was "the classic case of a negotiation that never led to a final deal." Following a hearing, at which all parties agreed the trial court could properly consider the above agreements in ruling on the motion, the trial court granted the motion and entered an order dismissing Plaintiff's claims with prejudice. This timely appeal followed.

II

Arrowfish argues the trial court erred in granting the SAH Defendants' motion to dismiss its claims under CR 12(b)(6). This court reviews a trial court's order granting a motion to dismiss under CR 12(b)(6) de novo. *Wahkiakum Sch. Dist. No. 200 v. State*, 2 Wn.3d 63, 77, 534 P.3d 808 (2023). Dismissal under CR 12(b)(6) is appropriate if "'it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief.'" *Bowman v. John Doe Two*, 104 Wn.2d 181, 183, 704 P.2d 140 (1985) (quoting *Orwick v. Seattle*, 103 Wn.2d 249, 254, 692 P.2d 793 (1984)). "We presume the facts in the complaint are true and reject the motion to dismiss if '[a]ny hypothetical situation conceivably raised by the complaint . . . is legally sufficient to support the plaintiff's claim.'" *Tavaglione v. Dehkhoda & Qadri, P.C.*, 34 Wn. App. 2d 515, 520,

568 P.3d 1158 (2025) (quoting *Jackson v. Quality Loan Serv. Corp. of Wash.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015)).

While the standard for deciding a CR 12(b)(6) motion is "forgiving," as Arrowfish repeatedly emphasizes, it is not toothless. *See, e.g., Kinney v. Cook*, 159 Wn.2d 837, 846, 154 P.3d 206 (2007) (reinstating order of dismissal "[d]espite the forgiving standard of a CR 12(b)(6) motion"). As the above cases confirm, any hypothetical facts offered in support of a claim must be "consistent with" and "conceivably raised" by the complaint. Additionally, the complaint's legal conclusions need not be accepted as true. *Jackson*, 186 Wn. App. at 843. "If a plaintiff's claim remains legally insufficient even under his or her proffered hypothetical facts, dismissal pursuant to CR 12(b)(6) is appropriate." *Id.* at 843-44 (quoting *Gorman v. Garlock, Inc.*, 155 Wn.2d 198, 215, 118 P.3d 311 (2005)). And in some circumstances, a CR 12 motion may provide an appropriate vehicle to determine a "'core issue . . . of law'" where the "'basic operative facts are undisputed.'" *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 830 n.7, 355 P.3d 1100 (2015) (quoting *Trujillo v. Nw. Tr. Servs., Inc.*, 181 Wn. App. 484, 492, 326 P.3d 768 (2014)). This is so when "'[n]o purpose'" exists for allowing an opportunity to present evidence under CR 56 because "'whatever might be proven would be immaterial.'" *Ortblad v. State*, 85 Wn.2d 109, 111, 530 P.2d 635 (1975) (quoting *Loger v. Wash. Timber Prods., Inc.*, 8 Wn. App. 921, 924, 509 P.2d 1009 (1973)).

Applying these legal standards, we address each of Arrowfish's claims in turn.

A

Arrowfish first argues the trial court erred in dismissing its breach of contract claim. That is so, it avers, because its "allegations demonstrate there was a meeting of the minds" sufficient to create an enforceable contract even if certain documents between the parties were not fully signed. We disagree.

A plaintiff alleging a claim for breach of contract must show a valid contract, a breach of duty arising under that contract, and resulting damage. *Silvey v. Numerica Credit Union*, 23 Wn. App. 2d 535, 544, 519 P.3d 920 (2022). To establish that a valid contract was formed, the party alleging the existence of the contract must demonstrate that the parties objectively manifested their mutual assent to be bound by all material terms of the same agreement at the same time. *Becker v. Wash. State Univ.*, 165 Wn. App. 235, 246, 266 P.3d 893 (2011), *review denied*, 173 Wn.2d 1033, 277 P.3d 668 (2012); *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 48, 470 P.3d 486 (2020); *P.E. Systems, LLC v. CPI Corp.*, 176 Wn.2d 198, 207, 209, 289 P.3d 638 (2012). Additionally, the terms assented to must be sufficiently definite. *Becker*, 165 Wn. App. at 246. The essential terms to a contract include the "subject matter, parties, promise, terms and conditions, and price or consideration." *Id.* While the parties' mutual assent to definite terms is normally a question of fact, it may be determined as a matter of law if reasonable minds could not differ. *P.E. Systems*, 176 Wn.2d at 207.

Applying these legal principles to the facts alleged in the complaint as well as the Bressi Agreements themselves, the trial court did not err in dismissing Arrowfish's breach of contract claim because Arrowfish's allegations and

hypothetical facts that may be drawn consistent with the complaint and the documents do not show that the parties objectively manifested their mutual assent to be bound by the agreements. Arrowfish relies on the Lease Agreement, the Site Development Agreement, and the Operating Agreement for its breach of contract claim, but none of these documents are enforceable contracts that could give rise to a breach of contract claim.[1] The Lease Agreement explicitly conditioned its effectiveness on the full execution and delivery of the Lease, the Operating Agreement, the Site Development Agreement, and the Management Agreement. Additionally, as a real estate lease agreement with an initial term of ten years, the Lease Agreement falls under the statute of frauds and must be signed by the party to be charged under the contract to be valid. *See* CP 273; RCW 19.36.010 ("[e]very agreement that by its terms is not to be performed in one year from the making thereof" must "be in writing, and signed by the party to be charged therewith"); RCW 64.04.010 ("[e]very conveyance of real estate, or any interest therein . . . shall be by deed"). The undisputed record shows the Lease Agreement was never signed by any party and was never fully executed. Similarly, the Site Development Agreement, though signed by the parties, explicitly conditioned its effectiveness on the execution of the Lease Agreement, which never happened. These documents demonstrate the parties' intent to be bound only upon execution of various other agreements. Because such execution never occurred, these

---

[1] While in its complaint Arrowfish appeared to base its breach of contract claim, in part, on the Management Agreement and the Sublease Agreement, Arrowfish has since abandoned that argument and now appears to use the Management Agreement and Sublease Agreement to "illustrate SAH"s bad faith and deceptive conduct" and "provide critical context about SAH's role in the larger ownership and control structure surrounding the Bressi Garage property." Thus, we do not address the complaint's allegations regarding the Management Agreement and the Sublease Agreement for Arrowfish's breach of contract claims.

documents cannot help Arrowfish demonstrate the parties' mutual assent to be bound by their terms.

Moreover, the Operating Agreement is not an enforceable contract because Arrowfish cannot demonstrate the parties mutually assented to an essential term to the contract: the parties involved. Originally, the parties to the Operating Agreement were Arrowfish, SAH Bressi Investment, and CHI. But sometime after September 2023, CHI was "pushed out" and replaced in negotiations with OVGH. From 2023 to April 2024, when the SAH Defendants ended the parties' negotiations, Arrowfish and SAH Bressi Investment never circulated a modified, updated, or edited version of the Operating Agreement replacing CHI with OVGH. When Arrowfish "revisited the final execution of the remaining documents" and repeatedly requested updates from the SAH Defendants, all it received was "months of radio silence." Thus, the record does not show there was mutual assent to all essential terms to the Operating Agreement sufficient to create an enforceable contract. Given this analysis, Arrowfish's breach of contract claim fails as a matter of law.

Despite this, Arrowfish argues "the parties' course of conduct establishes an agreement between the parties existed." But Arrowfish relies on cases about contract interpretation, not contract formation. For example, Arrowfish relies on *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996), to argue "extrinsic evidence is admissible in order to assist the court in ascertaining the intent of the parties." Viewed in context, *U.S. Life Credit* instructs that extrinsic evidence may be admissible when "interpreting the contract," not when

determining the validity of a contract's formation. 129 Wn.2d at 569. Indeed, *U.S. Life Credit* states that "extrinsic evidence cannot be considered for the purpose of varying the terms of a written contract," as such evidence is not admitted to show "intention independent of the instrument." *Id.* at 569-70 (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 669, 801 P.2d 222 (1990)). The instruments here— the Bressi Agreements—are interdependent and were intended (by their plain language) to function together as a cohesive set of agreements. As detailed above, some of the documents fail to comply with the statute of frauds while others are unsigned and not effective by their terms. On this record, Arrowfish cannot conceivably allege, nor does the record show, that the parties' course of conduct establishes the existence of a valid and binding agreement.

Nor has Arrowfish established that we can properly overlook the fact that most of the agreements are unsigned or not signed by all of the parties to the agreement. In a RAP 10.8 statement of additional authorities addressing this issue, Arrowfish cited *Shelcon Const. Grp., LLC v. Haymond*, 187 Wn. App. 878, 895, 351 P.3d 895 (2015), *Stephens v. Carrara*, 401 A.2d 821, 824 (Pa. Super. Ct. 1979), and *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559 Pa. 56, 67, 739 A.2d 133 (1999). These cases address other issues, such as satisfying the requirement that an agreement be in writing (*Shelcon*), and ultimately turn on the intent of the parties to be bound despite the lack of a signature (*Stephens* and *Shovel Transfer*). Here, as noted, the agreements at issue are unsigned, incomplete, ineffective, and/or dependent on other agreements that are likewise

unsigned, incomplete, or ineffective—thus precluding any argument that the parties nonetheless intended to be bound.

Arrowfish also argues part performance has "evolved to prevent the SOF [(Statute of Frauds)] from being used as an instrument of fraud" "even if certain documents . . . were not fully signed." In so arguing, Arrowfish relies on *Friedl v. Benson*, 25 Wn. App. 381, 609 P.2d 449 (1980), and *Miller v. McCamish*, 78 Wn.2d 821, 479 P.2d 919 (1971), but such reliance is misplaced. In *Friedl*, the plaintiffs sought enforceability of several proposed agreements, including two written lease documents signed by all parties and an option agreement to purchase a new building that referred to the purchase price only as a "price to be determined." *Id.* at 385, 388-89. The lease documents contained the subject matter of the contract, the parties, the promise, the terms and conditions, and the consideration. *Id.* at 387-88. Thus, the court held the lease contract satisfied the statute of frauds because it "contained all of the essential and material parts" of a lease. *Id.* at 388. But the court concluded the option agreement was not in compliance with the statute of frauds because it did not contain all essential and material parts of an option to purchase real estate. *Id.* at 389. Additionally, the court concluded the plaintiff's alleged acts of part performance were insufficient to remove it from the requirement of the statute of frauds. *Id.*

In *Miller*, the parties entered into an oral agreement whereby McCamish hired Miller to run McCamish's farm and Miller would live on the farm rent free. 78 Wn.2d at 822. McCamish would pay Miller $6,000 yearly but retain $3,000 of that amount to be applied to the purchase price of the farm should Miller wish to buy it

at some future time. *Id*. Miller began running the farm and moved there. *Id.* at 823. Thereafter, the parties had a falling out and Miller sued McCamish for money damages based on McCamish's alleged breach of the parties' oral contract. *Id*. at 823-24. In this context, the Washington Supreme Court held that oral contracts for the sale or lease of real property may be taken out of the statute of frauds if acts constituting part performance "point unmistakably and exclusively to the existence of the claimed agreement." *Id*. at 826.

Here, in contrast, even assuming Arrowfish pled sufficient facts to demonstrate an oral contract existed between the parties, Arrowfish has not conceivably alleged acts constituting part performance that "point unmistakably and exclusively to the existence" of a real estate contract. Instead, Arrowfish alleged it performed services for the SAH Defendants, including "designing brand assets," "[a]ssisting with the creation of marketing and PR plans," and "creating a menu and list of food vendors." Additionally, unlike the signed lease agreements in *Friedl* that contained all the essential parts of a lease, the Lease Agreement Arrowfish relies on here remained unsigned by any party. Thus, *Miller* and *Friedl* are inapposite. Despite the forgiving standard of a CR 12(b)(6) motion, the trial court did not err in granting the SAH Defendants' motion to dismiss Arrowfish's breach of contract claim.

B

Arrowfish next argues the trial court erred in dismissing its breach of the duty of good faith and fair dealing claim. That is so, it asserts, because it alleged in its complaint numerous facts demonstrating the SAH Defendants engaged in

conduct that "abused its contractual discretion" and "evaded the spirit of the parties' bargain." Because Arrowfish misapplies the legal principles governing such a claim, its argument fails.

The implied duty of good faith and fair dealing obligates parties to a contract to cooperate with each other so that each may obtain the full benefit of performance. *Rekhter v. Dep't of Soc. & Health Srvs.*, 180 Wn.2d 102, 112-13, 323 P.3d 1036 (2014). But this duty does not create a "free-floating obligation" of good faith. *Silvey*, 23 Wn. App. 2d at 556. It arises only in the context of an enforceable contract and in connection with the specific terms agreed to by the parties. *Rekhter*, 180 Wn.2d at 113. "In particular, the duty of good faith and fair dealing arises 'when the contract gives one party discretionary authority to determine a contract term.'" *Id.* (quoting *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997)).

The trial court did not err in dismissing Arrowfish's breach of the duty of good faith and fair dealing claim because Arrowfish's allegations and hypothetical facts that may be drawn consistent with them fail to show a valid, enforceable contract on which it could base such a claim. As discussed in part II.A above, Arrowfish has not demonstrated that any of the Bressi Agreements were enforceable contracts that gave rise to legal obligations between the parties. Because there was no mutual assent as to the terms of the agreements and thus no valid contracts between Arrowfish and the SAH Defendants, the SAH Defendants did not have discretionary authority to determine a future contract term and therefore did not owe Arrowfish a duty of good faith and fair dealing. *See*

*Rekhter*, 180 Wn.2d at 113. Thus, the trial court did not err in dismissing Arrowfish's claim for breach of this duty.

Arrowfish now presents a new argument on appeal regarding the Washington Limited Liability Company Act. Arrowfish argues its "claims are not dependent on the existence of a written contract" because "they flow directly from its statutory rights as a managing member of a lawfully formed LLC." Arrowfish thus requests that we evaluate whether the facts alleged in its complaint can establish a breach of an implied fiduciary duty under the Limited Liability Company Act. But Arrowfish never raised these arguments below and did not include a claim for breach of fiduciary duty in its complaint. Instead, the complaint alleged only a breach of the implied duty of good faith and fair dealing based on the Bressi Agreements. In accordance with RAP, 2.5 we decline to address Arrowfish's argument regarding this new claim.

C

Arrowfish likewise argues the trial court erred in dismissing its breach of an implied-in-fact contract claim. In support of this claim, Arrowfish alleges the parties had a longstanding business relationship and course of conduct that showed "both parties acting in accordance with terms set forth in the agreements." Again, the trial court correctly dismissed this claim.

An implied-in-fact contract is "an agreement depending for its existence on some act or conduct of the party sought to be charged and arising by implication from circumstances which . . . show a mutual intention on the part of the parties to contract with each other." *Young v. Young*, 164 Wn.2d 477, 485-86, 191 P.3d

1258 (2008) (quoting *Johnson v. Nasi*, 50 Wn.2d 87, 91, 309 P.2d 380 (1957)). An implied-in-fact contract is "founded in the law of contracts," not on notions of justice and equity. *Id.* at 486. Thus, it requires "a meeting of the minds, and an agreement of the parties arrived at from their conduct rather than their expressions of assent." *MacDonald v. Hayner*, 43 Wn. App. 81, 85, 715 P.2d 519 (1986). An implied-in-fact contract has "no distinction from an express or written contract in terms of its legal consequences. It simply differs in the mode of its proof." *Plumbing Shop, Inc. v. Pitts*, 67 Wn.2d 514, 517, 408 P.2d 382 (1965).

The trial court did not err in dismissing Arrowfish's implied-in-fact contract claim because Arrowfish had not demonstrated the parties' mutual assent to the Bressi Agreements. Arrowfish appears to argue the parties' conduct embraced the written terms of the Bressi Agreements and therefore created obligations under those agreements even though the written documents were never fully executed. But Arrowfish has not shown how these unenforceable agreements can form the basis for the parties' mutual assent to contract with each other. Arrowfish itself acknowledged the unenforceable nature of the Bressi Agreements in its complaint, wherein it states that it "revisited the final execution of the remaining documents" and was assured "everything was fine, and the documents would be executed in short order." Additionally, the record does not show the parties mutually assented to the Bressi Agreements by their conduct because the agreements clearly reflect the parties' intention to be bound only upon final execution of the agreements. Thus, Arrowfish cannot demonstrate the parties created an implied-in-fact contract.

Despite this, Arrowfish argues the parties "mutually consented and intended to agree to the terms of the Bressi Agreement." But this argument appears to allege the creation of an unenforceable agreement to agree, not an enforceable implied-in-fact contract. Under Washington contract law, an agreement to agree is "an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete." *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 175-76, 94 P.3d 945 (2004) (quoting *Sandeman v. Sayres*, 50 Wn.2d 539, 541-42, 314 P.2d 428 (1957)).

As *Keystone* confirms, agreements to agree are unenforceable. *Id.* at 176. There, Xerox decided to sell a facility it owned and Keystone submitted a letter of intent to purchase the facility. *Id.* at 174. After more communication, Xerox responded it was "prepared to negotiate a Purchase and Sale Agreement . . . subject to two modifications to your Proposal." *Id.* at 175. After Keystone accepted the modifications to its proposal, it alleged all the key terms of the agreement were settled and Xerox was therefore obligated to prepare a purchase and sale agreement. *Id.* However, the Washington Supreme Court concluded Xerox at most manifested an intent to negotiate with Keystone. *Id.* at 179. The court noted "an intention to do something 'is evidence of a future contractual intent, not the present contractual intent essential to an operative offer.'" *Id.* (quoting *Pac. Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 556, 608 P.2d 266 (1980)).

Similarly here, Arrowfish argues the parties created enforceable contractual obligations based on their intention to agree to the terms of the Bressi Agreements. But the parties' intent to agree to the terms of the Bressi Agreement at a future

time cannot show the present mutual assent required to establish either a written contract or an implied-in-fact contract. Instead, it is, at most, an unenforceable agreement to agree. Thus, neither Arrowfish's allegations nor any hypothetical facts that may be drawn consistent with them establish the essential elements of an implied-in-fact contract, and the trial court did not err in so concluding.

D

Arrowfish next argues the trial court erred in dismissing its promissory estoppel claim. It asserts such a claim "is grounded in equitable principles and does not depend on the existence of a finalized written agreement." Here too, Arrowfish's argument is unavailing because it misapplies the legal principles that govern this claim.

To recover on a claim of promissory estoppel, a plaintiff must establish five elements: (1) a promise which (2) the promisor should reasonably expect to cause the promisee to change their position and (3) which does cause the promisee to change their position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise. *Washington Educ. Ass'n v. Wash. Dep't of Ret. Sys.*, 181 Wn.2d 212, 224-25, 332 P.3d 428 (2014). Critically, promissory estoppel "'requires the existence of a promise.'" *Id.* at 225 (quoting *Havens v. C & D Plastics, Inc.*, 124 Wn.2d 158, 172, 876 P.2d 435 (1994)). For purposes of a promissory estoppel claim, Washington courts have adopted the Second Restatement's definition of "promise," which defines the term as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been

made." RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (AM. LAW INST. 1981). "A statement of future intent is not sufficient to constitute a promise for the purpose of promissory estoppel," as the "intention to do a thing is not a promise to do it." *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 13, 98 P.3d 491 (2004). While promissory estoppel "may apply in the absence of mutual assent or consideration," it "may not be used as a way of supplying a promise." *Havens*, 124 Wn.2d at 173.

The trial court did not err in dismissing Arrowfish's promissory estoppel claim for two reasons. First, Arrowfish cannot establish the requisite promise needed for a promissory estoppel claim. As discussed above, the Bressi Agreements Arrowfish relies on for its promissory estoppel claim were not enforceable contracts. And neither could the Bressi Agreements form the basis for Arrowfish's promissory estoppel claim because the terms contained in the agreements were not promises. These were five documents in an interdependent set of agreements that were still being negotiated when the SAH Defendants ended negotiations with Arrowfish. No commitment to perform had yet been made and the allegations in the complaint show that the parties understood the documents were not final contracts or promises because Arrowfish continuously requested updates "regarding the status of finalized documents" and was told that the SAH Defendants were "waiting for a couple of final approvals." These unenforceable agreements illustrate the parties' intent to negotiate; but as Washington courts have held, statements of future intent are not sufficient to constitute a promise. *See Elliott Bay*, 124 Wn. App. at 13. Nor can the doctrine of

promissory estoppel enable Arrowfish to artificially create a promise where, as here, none exists.

Second, Arrowfish does not conceivably allege that it changed its position in reliance on any oral promise the SAH Defendants made. In its complaint, Arrowfish alleged it "dedicated all of its resources to working on the Bressi Garage project" after the parties executed the MOU. After Arrowfish was already working on the Bressi Garage project, the parties began to prepare and negotiate the final agreements that would govern their relationship. With this background as context, Arrowfish alleged the SAH Defendants "made a number of oral promises to Arrowfish regarding the Bressi Garage project" that it "relied on . . . as it *continued* to dedicate significant resources and money on the Bressi Garage project." (Emphasis added.) Arrowfish did not change its position because it had already performed work and dedicated resources to the Bressi Garage project while the parties continued to negotiate toward enforceable contractual agreements. Thus, taking the facts in the complaint as true and considering additional hypothetical facts consistent with and raised by the complaint, Arrowfish's promissory estoppel claim is and remains legally insufficient. The trial court correctly granted this portion of the SAH Defendants' motion to dismiss. *See Jackson*, 186 Wn. App. at 843-44 ("If a plaintiff's claim remains legally insufficient even under his or her proffered hypothetical facts, dismissal pursuant to CR 12(b)(6) is appropriate.").

Arrowfish's contrary argument lacks merit. It argues it "alleged facts consistent with *Klinke* [*v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 616 P.2d 644 (1980)]," which it claims illustrates how "Washington courts recognize

promissory estoppel as an exception to the SOF." But Arrowfish's reliance on *Klinke* is misplaced. There, Klinke, a franchisee, brought an action for damages against Famous, a franchisor, for breach of an oral contract under which Klinke was to open and operate a fried chicken franchise outlet. *Id.* at 256-58. The court concluded that promissory estoppel may serve as the basis for Klinke's action for damages because Famous promised to make and execute a written franchise agreement. *Id.* at 259-60. This promise to make a memorandum of the party's oral contract and Famous' corresponding breach allowed Klinke to bring the action for promissory estoppel notwithstanding the statute of frauds. *Id.* at 260.

By contrast, Arrowfish has not alleged what oral promise the SAH Defendants made that it relied on to even establish whether such a promise is within the statute of frauds. Arrowfish has not, for example, alleged any facts either in its complaint or on appeal that the SAH Defendants made and breached an oral promise to memorialize the parties' agreement in a written memorandum. Thus, *Klinke* is not applicable to these facts. Additionally, as discussed above, even considering hypothetical facts alleged by Arrowfish on appeal, Arrowfish can prove no set of facts, consistent with the complaint, that would entitle it to relief on its promissory estoppel claim because the parties' relationship and obligations were intended to be fully prescribed and detailed by the written, unenforceable Bressi Agreements. Thus, Arrowfish has not established the trial court erred in dismissing its promissory estoppel claim.

E

Next, Arrowfish argues the trial court erred in dismissing its unjust enrichment claim. We again disagree.

Unjust enrichment is a type of implied contract between parties. *Lavington v. Hillier*, 22 Wn. App. 2d 134, 143, 510 P.3d 373 (2022) (citing *Young*, 164 Wn.2d at 483-84). This cause of action allows a plaintiff to recover for the value of a benefit the defendant retained based on principles of equity and fairness, despite the lack of a formal contractual relationship. *Id.* at 143-44. A claim for unjust enrichment requires three elements: (1) the defendant receives a benefit, (2) the benefit received is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment. *Id.* at 144. Critical here, "[e]nrichment alone will not suffice to invoke the remedial powers of a court of equity. It is critical that the enrichment be unjust both under the circumstances and as between the two parties to the transaction." *Puget Sound Sec. Patrol, Inc., v. Bates*, 197 Wn. App. 461, 475, 389 P.3d 709 (2017) (quoting *Farwest Steel Corp. v. Mainline Metal Works, Inc.*, 48 Wn. App. 719, 732, 741 P.2d 58 (1987)). This equitable relief is intended to "undo an inequity, such as the receipt of ill-gotten gains, and to 'force the defendant to give up a gain that had been acquired wrongfully or that would be wrongful to be kept without payment.'" *Nwauzor v. The Geo Grp., Inc.*, 2 Wn.3d 505, 525, 540 P.3d 93 (2023) (quoting HOWARD O. HUNTER, MODERN LAW OF CONTRACTS § 15:4 (2023) (*Concepts of Public Law and Justice, Unjust Enrichment, and Receipt of Benefit*)).

The trial court did not err in dismissing Arrowfish's unjust enrichment claim because there was nothing unjust about the SAH Defendants benefiting from Arrowfish's work on the Bressi Garage project. The record shows the SAH Defendants and Arrowfish executed a MOU that served as a "framework document" for future "definitive documentation." After the parties executed the MOU, Arrowfish worked on the Bressi Garage project and was "provided certain compensation . . . for its work" until the SAH Defendants decided to walk away from the relationship and end negotiations with Arrowfish. All the work Arrowfish alleged it dedicated to the Bressi Garage project and which allegedly benefited the SAH Defendants was completed within the bounds and framework of the MOU. Arrowfish thus fails to allege that the SAH Defendants *wrongfully* acquired any benefit or that it was *wrongful* for the SAH Defendants to benefit from Arrowfish's work under the parties' arrangement. The trial court correctly dismissed this claim.

Despite this, Arrowfish argues the SAH Defendants "induced Arrowfish to believe it would share in a highly profitable venture" and "should not be permitted to retain those benefits unjustly." *Austin v. Ettl*, 171 Wn. App. 82, 286 P.3d 85 (2012), is instructive regarding this third prong of an unjust enrichment claim— whether circumstances exist that make it unjust for the defendant to retain the benefit. In *Austin*, Austin purchased the Ettls' Tacoma property which contained two proposed local improvement districts (LIDs). *Id.* at 84-85. On the closing date, the Ettls disclosed the two proposed LIDs on the property but did not disclose the potential costs of each LID assessment. *Id.* at 85. Austin signed the closing documents without requesting more information and without asking to extend the

closing date. *Id.* After Austin learned the proposed LIDs were approved and the City of Tacoma had assessed the LIDs' costs against the property at over $40,000, Austin sued the Ettls, alleging the Ettls' failure to disclose the potential costs of the proposed LIDs resulted in their unjust enrichment. *Id.* at 85-86. The trial court dismissed Austin's suit under CR 12(b)(6). *Id.* at 86. The court of appeals affirmed the trial court's dismissal of Austin's unjust enrichment claim, noting the claim failed as a matter of law because the Ettls had "no duty to disclose the potential costs of the not-yet-extant LIDs." *Id.* at 92. Thus, because no statute or common law required anything more of the Ettls, "there was nothing inequitable about the Ettls' benefiting from Austin's languid approach to purchasing their home." *Id.*

Similarly, here, the SAH Defendants were under no obligation to continue their relationship with Arrowfish until a final agreement was reached. Washington courts have refused to impose a duty to continue negotiations in the absence of an enforceable contract. *See Keystone*, 152 Wn.2d at 180 ("Keystone asks us to imply a duty to continue negotiations until a final agreement is reached . . . We decline to create and impose a duty to go forward in the absence of an enforceable contract."). The parties here did not have a contract to continue negotiations until a final, enforceable agreement was reached and thus had no duty to do so. Just as the circumstances in *Austin* revealed nothing inequitable about the Ettls retaining a benefit, there was nothing inequitable here about the SAH Defendants ending negotiations before a final, enforceable agreement was reached and retaining a benefit from Arrowfish's work toward such an agreement. Thus, the trial court did not err in dismissing Arrowfish's unjust enrichment claim.

F

Next, Arrowfish argues the trial court abused its discretion in dismissing its claims "with prejudice" and thus without leave to amend. Again, we disagree.

The decision to grant leave to amend the pleadings is within the discretion of the trial court. *Wilson v. Horsley*, 137 Wn.2d 500, 505, 974 P.2d 316 (1999). Thus, we review the trial court's denial of leave to amend for abuse of discretion. *Rodriguez v. Loudeye Corp.*, 144 Wn. App. 709, 728-29, 189 P.3d 168 (2008). Such abuse occurs when the decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *Wilson*, 137 Wn.2d at 505. Critical here, Washington courts have consistently held that a trial court does not abuse its discretion in denying a motion for leave to amend if amendment would be futile. *See, e.g.*, *Colvin v. Inslee*, 195 Wn.2d 879, 901, 467 P.3d 953 (2020); *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 142, 937 P.2d 154 (1997) (plurality opinion); *Orwick v. Fox*, 65 Wn. App. 71, 89, 828 P.2d 12 (1992) (citing *Doyle v. Planned Parenthood of Seattle-King County, Inc.*, 31 Wn. App. 126, 131, 639 P.2d 240 (1982)).

Given our analysis above, the trial court did not abuse its discretion in denying leave to amend because any such amendment would have been futile. Arrowfish's various claims can be described as an injury in search of a cause of action. While the SAH Defendants do not deny that Arrowfish devoted substantial time and money in pursuing a binding—and mutually beneficial—contractual agreement, the only agreement that was signed and effective was the MOU, which expressly states that it "will serve as a non-binding understanding of the intent of

the Parties" and will guide the parties in their "negotiations towards definitive documentation." Given this "agreement" and the related agreements (none of which is both signed and effective), the trial court correctly dismissed Arrowfish's complaint with prejudice without granting leave to amend as any such amendment would have been futile.[2]

Affirmed.

_Feldman, J._

WE CONCUR:

_Chung, J._                    _Smith, J._

---

[2] While not germane to our substantive analysis, the court notes that appellant's opening brief included several erroneous citations that the responsible attorneys at Corr|Downs PLLC have since indicated were generated by "AI-based search engines." The citations for these cases appear to be a compilation of (a) a real or fictitious caption, (b) citations to other entirely different cases, and (c) legal principles that cannot reasonably be found in the cited cases. The conduct leading to these citations falls below our expectations of counsel, particularly since it is now well known in the legal community that AI resources can generate erroneous citations and false quotations. Understanding the gravity of this conduct, the responsible attorneys have taken steps to remediate the situation, have apologized to the court, and have represented that they are implementing additional quality-control protocols (as all lawyers should) to ensure this does not happen again.